# CHRISTOPHER BARKER *v.* ALL ROOFS BY DOMINIC ET AL.
## (SC 20196)

Robinson, C. J., and Palmer, McDonald, Kahn, Ecker, Vertefeuille and Elgo, Js.*

### *Syllabus*

Pursuant to a provision of the Workers' Compensation Act (§ 31-291), "[w]hen any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation . . . to the same extent as if the work were done without the intervention of such contractor or subcontractor."

The defendants city of Bridgeport and its insurer, P Co., appealed from the decision of the Compensation Review Board, which affirmed the decision of the Workers' Compensation Commissioner, who had found that the city was the plaintiff's principal employer and, therefore, liable for the plaintiff's workers' compensation benefits. The plaintiff had been employed by H Co., an uninsured subcontractor of the city, when he was injured while doing repair work to the roof of the city's transfer facility. The plaintiff sought workers' compensation benefits, and, following a hearing, the commissioner found that, because he was an employee of an uninsured subcontractor when he suffered his compensable injury, the Second Injury Fund was statutorily (§ 31-355) required to pay his workers' compensation benefits. The Second Injury Fund subsequently contested liability on the ground that, pursuant to § 31-291, the city was the plaintiff's principal employer when he suffered his injury and, therefore, was required to pay the workers' compensation benefits owed to him. Following additional hearings, the commissioner determined that, under *Massolini* v. *Driscoll* (114 Conn. 546), a municipality can be held liable as a principal employer under § 31-291, that the city had a statutory (§ 7-148) duty to manage, maintain, and repair its property, including the transfer facility, and that repairing the transfer facility's roof was a part or process in the city's trade or business within

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, Kahn and Ecker. Thereafter, Justice Vertefeuille and Judge Elgo were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

336 Conn. 592 MAY, 2021 593

Barker *v.* All Roofs by Dominic

the meaning of § 31-291. Accordingly, the commissioner found that the city was the plaintiff's principal employer and ordered the city and P Co. to pay his workers' compensation benefits. The city and P Co. appealed to the board, which affirmed the commissioner's decision. Thereafter, the city and P Co. appealed to the Appellate Court, which upheld the board's decision. On the granting of certification, the city and P Co. appealed to this court. *Held* that the Appellate Court correctly concluded that, under § 31-291, the city was liable as the plaintiff's principal employer for workers' compensation benefits to which he was entitled as a result of the injuries he sustained repairing the roof of the city's transfer facility while employed by the city's uninsured subcontractor: whether an uninsured contractor's or subcontractor's work is a part or process in the trade or business of the principal employer under § 31-291 is a fact specific determination to be made in light of certain nondispositive factors, including the employer's legally defined powers and obligations, the complexity of the work being performed and the degree of specialization required, whether the employer supplied the tools or materials or oversaw the work, and whether the work was of such a character that it ordinarily would be performed by the employer's own employees or was an otherwise essential part in the maintenance or operation of the employer's business; considering the relevant factors in light of the record, as well as § 31-291's broader remedial purpose of preventing employers from denying workers full protection under the workers' compensation scheme by simply hiring uninsured contractors or subcontractors, this court concluded that the commissioner reasonably determined that the repair of the transfer facility's roof was a part or process in the city's trade or business, as it was undisputed that the city was responsible pursuant to § 7-148 to maintain and repair its public buildings, the roof repairs at issue were not especially complex and did not demand specialized skills, and, although the city did not employ its own roofers for financial reasons despite employing a variety of other tradespeople to maintain and repair city property, the roof repair fell within the nature and scope of the maintenance and repair work ordinarily performed by city employees; moreover, this court declined the city and P Co.'s invitation to overrule *Massolini* insofar as it applies principal employer liability to municipalities, as that case's holding has, over the past eighty years, become embedded in Connecticut worker's compensation law, and the city and P Co. did not identify any ambiguity in the statutory scheme or any legislative history suggesting that the legislature intended to abrogate this court's holding in *Massolini* or to change the standards of principal employer liability through the creation of the Second Injury Fund, a primary purpose of which is, instead, to act as a payer of last resort when an employer is unable to pay.

(*Three justices dissenting in one opinion*)

Argued October 22, 2019—officially released August 13, 2020**

_____

** August 13, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Barker *v.* All Roofs by Dominic

*Procedural History*

Appeal from the decision of the Workers' Compensation Commissioner for the Third District determining that the defendant city of Bridgeport was the plaintiff's principal employer, brought to the Compensation Review Board, which affirmed the commissioner's decision; thereafter, the defendant city of Bridgeport et al. appealed to the Appellate Court, *Sheldon*, *Bright* and *Harper*, *Js.*, which affirmed the board's decision, and the defendant city of Bridgeport et al., on the granting of certification, appealed to this court. *Affirmed*.

*Joseph J. Passaretti*, *Jr.*, with whom, on the brief, was *Amanda A. Hakala*, for the appellants (defendant city of Bridgeport et al.).

*Lisa Guttenberg Weiss*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Philip M. Schulz*, assistant attorney general, for the appellee (Second Injury Fund).

*Opinion*

ECKER, J. The sole issue in this certified appeal is whether, under the Workers' Compensation Act, General Statutes § 31-291,[1] a municipality is the "principal employer" of an employee of an uninsured roofing subcontractor injured while repairing a municipal building. The defendants city of Bridgeport (city) and PMA Insur-

_____

[1] General Statutes § 31-291 provides in relevant part: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. . . ."

Barker *v.* All Roofs by Dominic

ance Company[2] contend that the city is not a principal employer under the statute because it is not in the "trade or business" of roof repair. The Second Injury Fund (fund) responds that the city is in the "trade or business" of maintaining and repairing municipal buildings and facilities, and, therefore, the Appellate Court properly affirmed the judgment of the Compensation Review Board (board), which found that the city was liable for the payment of the workers' compensation benefits of the plaintiff, Christopher Barker, as his principal employer. We agree with the fund and affirm the judgment of the Appellate Court.

The relevant facts and procedural history are not in dispute. In March, 2000, the city hired the defendant All Roofs by Dominic (All Roofs) to do repair work on the roof of the city's transfer facility located at 475 Asylum Street. All Roofs hired the defendant Howard Adams d/b/a Howie's Roofing (Howie's Roofing) as a subcontractor. On June 29, 2000, the plaintiff, an employee of Howie's Roofing, was injured in the course and scope of his employment when he fell from the roof under

---

[2] The defendants in the matter before the Workers' Compensation Commission were (1) the city, (2) the city's insurer, PMA Insurance Company, (3) the city's contractor, All Roofs by Dominic, and (4) Howard Adams d/b/a Howie's Roofing, the city's subcontractor and the employer of the plaintiff, Christopher Barker. After the Workers' Compensation Commissioner determined that the plaintiff's claim was compensable under the Workers' Compensation Act and that the plaintiff's employer was uninsured, the Second Injury Fund (fund) became obligated to compensate the plaintiff for his injuries under General Statutes § 31-355 (h). See footnote 3 of this opinion.

The plaintiff did not participate in the proceedings before the Compensation Review Board or the Appellate Court, but the fund participated in those proceedings as the appellee to defend the decision of the Workers' Compensation Commissioner that the city, rather than the fund, was liable for the payment of the plaintiff's workers' compensation benefits. The plaintiff likewise is not a party to the present appeal, and the fund is the appellee. All Roofs by Dominic did not seek review of the decision of the Workers' Compensation Commissioner and is not a party to the present appeal. All references to the defendants hereinafter are to the city and its insurer, PMA Insurance Company.

Barker *v.* All Roofs by Dominic

repair. After his fall, the plaintiff sought workers' compensation benefits from Howie's Roofing, All Roofs, and the city. Neither Howie's Roofing nor All Roofs carried a valid workers' compensation insurance policy.

A formal hearing was held before the Workers' Compensation Commission. On January 5, 2005, the Workers' Compensation Commissioner for the Fourth District determined that the plaintiff was an employee of Howie's Roofing when he suffered his work-related injury. Because Howie's Roofing was uninsured, that finding required the fund to pay the workers' compensation benefits owed to the plaintiff pursuant to General Statutes § 31-355.[3] The fund subsequently contested liability on the ground that, under § 31-291, the city was the principal employer of the plaintiff and, therefore, was required to pay the workers' compensation benefits owed to him.

Additional hearings were conducted before the Workers' Compensation Commission on November 19, 2015, and February 23, 2016, to determine the city's principal employer liability. The city conceded that it had hired All Roofs to perform work on the transfer facility and that the plaintiff's injury took place on municipal property under the city's control. The city denied, however, that the roofing work performed by All Roofs was a part or process in the city's trade or business, which is a prerequisite to establish principal employer liability

---

[3] General Statutes § 31-355 provides in relevant part: "(b) When an award of compensation has been made under the provisions of this chapter against an employer who failed, neglected, refused or is unable to pay any type of benefit coming due as a consequence of such award or any adjustment in compensation required by this chapter, and whose insurer failed, neglected, refused or is unable to pay the compensation, such compensation shall be paid from the Second Injury Fund. . . .

\* \* \*

"(h) When a finding and award of compensation [have] been made against an uninsured employer who fails to pay it, that compensation shall be paid from the Second Injury Fund . . . ."

Barker *v.* All Roofs by Dominic

under § 31-291. John F. Cottell, Jr., Deputy Director of Public Facilities for the city, testified that it was the responsibility of the public facilities department to maintain city-owned buildings, but he also testified that the city did not employ a roofer because the need was not extensive enough to justify the cost of employing one on a full-time basis.

In his written finding and orders, the Workers' Compensation Commissioner for the Third District (commissioner) determined that, under *Massolini* v. *Driscoll*, 114 Conn. 546, 551–52, 159 A. 480 (1932), a municipality can be liable as a principal employer under § 31-291. The commissioner also determined that, pursuant to General Statutes § 7-148,[4] the city has a statutory duty to manage, maintain, repair, and control its property, including its transfer facility. In addition, the commissioner concluded that the work of repairing the roof of the transfer facility was a part or process in the city's trade or business. The commissioner found that the city was the plaintiff's principal employer and ordered the defendants to pay the workers' compensation benefits to which the plaintiff was entitled. The defendants filed a motion to correct and a motion for articulation, both of which the commissioner denied.

The defendants appealed to the board, which affirmed the commissioner's decision. The defendants timely appealed from the board's decision to the Appellate Court. The Appellate Court affirmed the decision of the board. *Barker* v. *All Roofs by Dominic*, 183 Conn. App. 612, 623, 193 A.3d 693 (2018). We granted the defendants' petition for certification to appeal, limited to the following issue: "Did the Appellate Court [correctly]

[4] General Statutes § 7-148 (c) (6) (A) (i) provides in relevant part: "Any municipality shall have the power to do any of the following . . . [e]stablish, lay out, construct, reconstruct, alter, maintain, repair, control and operate . . . garbage and refuse disposal facilities . . . and any and all buildings or facilities necessary or convenient for carrying on the government of the municipality . . . ."

Barker *v.* All Roofs by Dominic

conclude that, under . . . § 31-291, as construed by *Massolini* v. *Driscoll*, [supra, 114 Conn. 546], the . . . city . . . was liable for workers' compensation benefits as the principal employer of a worker hired by an uninsured subcontractor to repair the roof of a building owned by the city?'' *Barker* v. *All Roofs by Dominic*, 330 Conn. 925, 926, 194 A.3d 292 (2018).

The defendants contend that roof repair is not a part or process in the city's trade or business under § 31-291, as construed by *Massolini*. Alternatively, the defendants argue that *Massolini* is no longer good law because (1) it utilizes an outdated definition of ''business'' under the principal employer statute, and (2) the subsequent creation of the fund has ''displaced'' *Massolini* by providing a ''logical alternative'' to the holding in that case. Lastly, the defendants argue that the imposition of principal employer liability against a municipality violates General Statutes § 31-286a (c).[5] In response, the fund argues that (1) *Massolini* remains controlling law, notwithstanding the subsequent creation of the fund, (2) pursuant to § 31-291, as construed by *Massolini*, the city is liable for the payment of workers' compensation benefits to the plaintiff as his principal employer, and (3) § 31-286a (c) has no application on this record.

Our standard of review applicable to workers' compensation appeals is well-settled. ''The conclusions

---

[5] General Statutes § 31-286a provides in relevant part: ''(a) . . . [N]either the state, or its agents, nor any political subdivision of the state, or its agents, may enter into any contract on or after October 1, 1986, for the construction, remodeling, refinishing, refurbishing, rehabilitation, alteration or repair of any public works project before receiving from each of the other parties to such contract [inter alia] sufficient evidence of compliance with the workers' compensation insurance and self-insurance requirements of subsection (b) of section 31-284 . . . .

* * *

''(c) This section shall not be construed to create any liability on the part of the state or any political subdivision thereof to pay workers' compensation benefits or to indemnify the Second Injury Fund, any employer or any insurer who pays workers' compensation benefits. . . .''

Barker *v.* All Roofs by Dominic

drawn by [the commissioner] from the facts found must
stand unless they result from an incorrect application
of the law to the subordinate facts or from an inference
illegally or unreasonably drawn from them. . . . It is
well established that [a]lthough not dispositive, we
accord great weight to the construction given to the
workers' compensation statutes by the commissioner
and [the] board.'' (Internal quotation marks omitted.)
*Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564,
572, 986 A.2d 1023 (2010). ''Our Workers' Compensation
Act indisputably is a remedial statute that should be con-
strued generously to accomplish its purpose.'' *Driscoll*
v. *General Nutrition Corp.*, 252 Conn. 215, 220, 752
A.2d 1069 (2000).

The principal employer statute provides in relevant
part: ''When any principal employer procures any work
to be done wholly or in part for him by a contractor,
or through him by a subcontractor, and the work so
procured to be done is a part or process in the trade
or business of such principal employer, and is per-
formed in, on or about premises under his control, such
principal employer shall be liable to pay all compensa-
tion under this chapter to the same extent as if the
work were done without the intervention of such con-
tractor or subcontractor. . . .'' General Statutes § 31-
291. The ''underlying purpose'' of the statute is to
impose liability in ''those situations [in which injurious]
conditions might be assumed to be largely within the
control or observation of the principal employer.'' *Wil-
son* v. *Largay Brewing Co.*, 125 Conn. 109, 112, 3 A.2d
668 (1939). Because ''[m]ost compensable injuries are
due to conditions of employment the danger from which
could be prevented or minimized by sufficient oversight
or control''; id.; the statute provides an incentive for
the principal employer to provide a safe working envi-
ronment for the contractors and subcontractors that
carry out any part or process in its trade or business.
See *Sgueglia* v. *Milne Construction Co.*, 212 Conn. 427,

Barker *v.* All Roofs by Dominic

433, 562 A.2d 505 (1989) (''[t]he purpose of § 31-291 is to protect employees of minor contractors against the possible irresponsibility of their immediate employers, by making the principal employer who has general control of the business in hand liable as if he had directly employed all who work [in] any part of the business [that] he has undertaken to carry on'' (internal quotation marks omitted)); *Johnson* v. *Mortenson,* 110 Conn. 221, 225, 147 A. 705 (1929) (principal employer statute ''afford[s] full protection to work[ers], by preventing the possibility of defeating the [Workers' Compensation Act] by hiring irresponsible contractors or subcontractors to carry on a part of the employer's work'').

The relevant portion of the principal employer statute has remained unchanged since the enactment of our original Workers' Compensation Act in 1913. See Public Acts 1913, c. 138, pt. B, § 5. The controlling decisional law is similarly long-standing. Since 1927, we consistently have applied a three-part test to determine principal employer liability under the Workers' Compensation Act. ''To render a principal employer liable, it is clear [that] this statute requires (1) that the relation of principal employer and contractor must exist in work wholly or in part for the former, (2) that the work must be in, on or about premises controlled by the principal employer, and (3) that the work be a part or process in the trade or business of the principal employer.'' *Crane* v. *Peach Bros.,* 106 Conn. 110, 113, 137 A. 15 (1927). The third prong of this test—the only one at issue in the present case—frequently is the most difficult to apply. See, e.g., *Fox* v. *Fafnir Bearing Co.,* 107 Conn. 189, 192–95, 139 A. 778 (1928). The question of whether the work at issue is included within an employer's trade or business largely is one ''of degree and fact.'' *Grenier* v. *Grenier,* 138 Conn. 569, 571, 87 A.2d 148 (1952). Fortunately, however, our precedent supplies ''a number of cases [in which] we have been called [on] to decide whether . . . [on] their particular facts they

Barker *v.* All Roofs by Dominic

fall within the provisions of the statute, and they afford a valuable basis for arriving at a general conception of its application.'' *King* v. *Palmer*, 129 Conn. 636, 639–40, 30 A.2d 549 (1943).

*Massolini* v. *Driscoll*, supra, 114 Conn. 546, is one such case, and it featured prominently in the present dispute to help guide the analysis of the commissioner, the board, and the Appellate Court, as well as in the parties' arguments before this court. In *Massolini*, the city of Hartford hired a contractor to provide a team of horses and a driver to collect ashes and rubbish left out by the public for removal. Id., 548. The driver employed by the contractor was fatally injured while tending to the horses' shoes, precipitating a workers' compensation claim. Id., 549. As in the present case, the issue in *Massolini* was whether the municipality was the employee's principal employer under the statute, and, as here, this question hinged on whether the work performed by the employee was a part or process in the city's trade or business. We held that, for a municipal corporation, the term "business" means "the conduct of the usual affairs of the corporation, and such as commonly engage the attention of its officers." Id., 552. We noted that Hartford was authorized to remove ashes and rubbish as part of its police powers; id., 551–52; and held that such work was a "business" of the city within the meaning of the Workers' Compensation Act. Id., 552. Because the driver's work on the horses' shoes was "incidental to and in furtherance of the operations involved in [that] business of [Hartford], a valid claim for compensation [had] been established against [Hartford]." Id., 553.[6]

---

[6] The dissent "find[s] most significant the fact that the driver in *Massolini* was working alongside Hartford's own employees at the time of his fatal injury." We respectfully disagree with this reading of *Massolini*. The factor identified by the dissent was not mentioned by the court in its application of the principal employer statute to the facts of that case. The primary factor determining the outcome in *Massolini* was that "Hartford was engaged in the removal of ashes and refuse in the exercise of its police powers";

Barker *v.* All Roofs by Dominic

We agree with the Appellate Court, the board, and the commissioner that *Massolini* provides useful guidance in the present case. The plaintiff in the present case was employed by one of the city's subcontractors to discharge an obligation imposed by law on the city itself, namely, the maintenance and repair of municipal buildings. As the commissioner found, and as no party disputes, the city had a responsibility to manage, maintain, and repair its public buildings, including its transfer facility, pursuant to § 7-148 (c) (6) (A) (i). See footnote 4 of this opinion. This conclusion is further supported by Cottell's testimony that it was the responsibility of the public facilities department to maintain city-owned buildings. The commissioner reasonably determined that maintenance of the transfer facility, including the repair of the facility's roof, was among "the usual affairs of the corporation, and such as commonly engage the attention of its officers" and, therefore, is a part or process in the city's business. *Massolini* v. *Driscoll*, 114 Conn. 552. Other states with similar "trade or business" language in their principal employer statutes have reached the same conclusion. See *Rodriquez* v. *John Russell Construction*, 16 Kan. App. 2d 269, 275, 826 P.2d 515 (1991) ("[r]oof repair was essential to protect the [public housing complex] and ensure that it remained habitable," and worker injured while doing so was statutory employee of municipality under workers' compensation statute); *Ford* v. *Richmond*, 239 Va. 664, 665, 669, 391 S.E.2d 270 (1990) (worker injured while repairing roof on city reservoir was statutory employee[7] of city under workers' compensation statute).[8]

*Massolini* v. *Driscoll*, supra, 114 Conn. 551–52; thus making "the disposal of ashes and rubbish . . . a 'business' in which . . . Hartford was engaged at the time of [the] accident . . . ." Id., 553.

[7] The terms "statutory employee" and "statutory employer" often are used in other states to refer to what our Workers' Compensation Act calls the "principal employer" relationship. See, e.g., Va. Code Ann. § 65.2-302 (2017).

[8] The dissent notes that the Virginia courts' approach, which looks only to the "duties, obligations, and responsibilities imposed [on governmental entities] by statute, regulation, or other means" for purposes of determining

Barker *v.* All Roofs by Dominic

We do not agree with the dissent's prediction that continuing[9] to give consideration to the legally defined powers and obligations of a city in determining its trade

principal employer status; (internal quotation marks omitted) footnote 6 of the dissenting opinion, quoting *Ford* v. *Richmond*, supra, 239 Va. 667; was criticized as "out of step" with other state courts in a two-sentence concurring opinion of the District of Columbia Circuit Court of Appeals. *Best* v. *Washington Metropolitan Area Transit Authority*, 822 F.2d 1198, 1202 (D.C. Cir.1987) (Mikva, J., concurring). Judge Mikva provided no analysis to accompany that criticism, but it appears that he would prefer an approach that determines principal employer status on the basis of whether the employer normally carries on a given activity through its own employees rather than through independent contractors. See id., 1200–1201 (describing "normal work" test rejected by Virginia Supreme Court in context of governmental entities (internal quotation marks omitted)). We, of course, agree with the dissent that an approach to determining principal employer status for governmental entities that looks *only* to their legal duties and obligations would be overly restrictive. But this court has long considered the powers and duties of public entities as a relevant factor in determining principal employer status. See footnote 9 of this opinion. The question of whether an employer ordinarily would perform certain work through its own employees rather than through contractors is likewise relevant to the principal employer inquiry; it simply is "not necessarily conclusive." *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974); accord *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 195. Our approach is in accordance with the principle that " 'no one exclusive test can be set up' " for determining principal employer status. *Battistelli* v. *Connohio, Inc.*, 138 Conn. 646, 652, 88 A.2d 372 (1952) (*Inglis, J.*, concurring), quoting *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950).

[9] The dissent is correct that the legally defined powers and obligations of a municipality ordinarily should not be dispositive in determining its "trade or business," but the nature and scope of those legally prescribed duties are relevant to the inquiry, and looking to those legal prescriptions for guidance is consistent with our decisions regarding principal employer liability for municipal corporations. For example, in *Massolini*, it was significant that Hartford was collecting rubbish and ashes pursuant to its police powers. See *Massolini* v. *Driscoll*, supra, 114 Conn. 551–52; see also *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974) (it was significant that public entity's charter authorized it to engage in work that plaintiffs had been performing when they were injured). Courts in states with similar "trade or business" language in their principal employer statutes have often looked to the powers, duties, and obligations of municipal corporations to determine the "business" of the corporation. See *Wright* v. *Honolulu*, 41 Haw. 603, 606 (1957) (tunnel construction was "properly a part of [the municipality's] business" under workers' compensation law when municipality was authorized by law to finance and fund project); *Klohn* v. *Louisiana Power & Light*, 406 So. 2d 577, 580–82 (La. 1981) (when city bond resolution required city to retain ownership of power plant system,

Barker *v.* All Roofs by Dominic

or business would "render a municipality the workers' compensation guarantor of virtually every employee of an independent contractor engaged by the city." As we explain elsewhere in this opinion, other factors, such as the complexity of the work in question; *Battistelli* v. *Connohio, Inc.*, 138 Conn. 646, 649, 88 A.2d 372 (1952); or the scale of the undertaking, as in *Grenier* v. *Grenier*, supra, 138 Conn. 569; see footnote 12 of this opinion; may place work outside of the trade or business of a municipality, even if that work falls generally within the city's legally defined powers and obligations. Importantly, a city may protect itself against the financial loss of a determination that it is the principal employer of an injured worker by taking the simple step of ensuring that any independent contractor it hires carries workers' compensation insurance, as the city is mandated to do by § 31-286a (a). See footnote 5 of this opinion. If a city takes that precaution, and if it is found liable to pay workers' compensation benefits as a principal employer, it may recover any sums that it pays as a result from the independent contractor. See *Sgueglia* v. *Milne Construction Co.*, supra, 212 Conn. 433–34 (between principal employer and subcontractor, latter is primarily liable); *Johnson* v. *Mortenson*, supra, 110 Conn. 228 (because liability of immediate employers is primary and liability of principal employers is secondary, principal employer may recover sums paid to injured worker from immediate employer).

city was in business of providing electric service, notwithstanding operating agreement that transferred all operations of plant to contractor); *Roberts* v. *Alexandria*, 246 Va. 17, 20, 431 S.E.2d 275 (1993) ("because the [c]ity is authorized and empowered [by state statute and the city charter] to operate the jail, and to provide medical services there, the delivery of those medical services are within the [c]ity's trade, business, or occupation"); see also *Leigh* v. *National Aeronautics & Space Administration*, 860 F.2d 652, 653 (5th Cir. 1988) (when federal statute authorized agency to develop, construct, test, and operate aeronautical and space vehicles, worker injured while performing test on external tank of space shuttle "was performing work that was part of the United States' business" for purposes of state workers' compensation law).

Barker *v.* All Roofs by Dominic

The defendants contend that roof repair is not a part or process in the city's business because the city did not employ any roofers. Although relevant to the determination of an employer's trade or business, this factor is not dispositive. We have held that, "[i]f the work is of such a character that it ordinarily or appropriately would be performed by the principal employer's own employees in the prosecution of its business, or as an essential part in the maintenance thereof, it is a part or process of his work.'' *King* v. *Palmer*, supra, 129 Conn. 641. We have made it clear that "no one exclusive test can be set up and that each case must be determined on its own facts . . . .'' *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950). A finding that the work in question ordinarily or appropriately is performed by the principal employer's own employees is *sufficient* to establish principal employer liability; see, e.g., *Kasowitz* v. *Mutual Construction Co.*, 154 Conn. 607, 613–14, 228 A.2d 149 (1967); but it is not a prerequisite to that liability. See *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 196, 355 A.2d 32 (1974) (observing that "this test is not necessarily conclusive'').

*Pacileo* v. *Morganti*, *Inc.*, 10 Conn. App. 261, 522 A.2d 841 (1987), is instructive on this point. In *Pacileo*, the Appellate Court considered whether the defendant, a general contractor hired to oversee the city of New Haven's city hall and library construction project, was the principal employer of the plaintiff, an ironworker injured on the work site. Id., 262. The Appellate Court noted that "the defendant's business, as the general contractor, was to oversee and implement the construction of the city hall library complex. . . . A necessary and expected part of that construction was the laying of steel rods for the pouring of concrete. Ironworkers generally lay steel rods. Since none of the individuals directly employed by [the defendant was] qualified to perform the job of ironworker . . . the utilization of

Barker *v.* All Roofs by Dominic

ironworkers such as the plaintiff was a part or process of the defendant's trade or business.'' (Internal quotation marks omitted.) Id., 264; see also *Adams* v. *Jodar Blasting, Inc.*, No. 1943, CRB 2-93-12 (January 17, 1996) (home construction business was principal employer of employee of contractor who was hired to blast rock at construction site, even though principal employer did not have any employees qualified to perform such work). Therefore, the defendant general contractor was the employee's principal employer under § 31-291, even though it ''did not directly employ any [ironworkers]'' or ''any . . . employees qualified to perform the job of [ironworkers].'' *Pacileo* v. *Morganti, Inc.*, supra, 263; see also *Kasowitz* v. *Mutual Construction Co.*, supra, 154 Conn. 608–609, 614 (The court held that the defendant general contractor was the primary employer of the plaintiff, who was an employee of a glass company hired to install windows, because the defendant was obligated by contract to ''complete . . . construction . . . in all respects, including the glass work. All of this was part of its business. It chose to enter into subcontracts for certain phases of the work, including the glass work, instead of hiring glaziers to do the work at the appropriate time.'').

The analogy to a general contractor is apt.[10] Just as the defendant's business in *Pacileo* was to ''oversee and

10 The dissent argues that *Pacileo* is distinguishable on the grounds that ''[a] general construction contractor, who voluntarily undertakes the organization of a major construction project as a commercial venture, is situated differently from a municipality that has broad statutory powers in a variety of areas . . . .'' Footnote 7 of the dissenting opinion. We agree that a municipality's business activity will generally be broader than that of a commercial enterprise focused on providing a particular product or service, but we do not see how this should be a *limiting* consideration when determining a municipality's trade or business. A municipality like Bridgeport has been conferred broad operational responsibilities. With those responsibilities come correspondingly broad obligations. In this regard, we repeat our observation that the legislature has seen fit to treat public and private employers without distinction or differentiation for purposes of determining principal employer status. We respectfully disagree that a consideration deemed rele-

Barker *v.* All Roofs by Dominic

implement'' a construction project; *Pacileo* v. *Morganti, Inc.*, supra, 10 Conn. App. 264; in the present case, the city's business includes, among other things, the maintenance and repair of its buildings and facilities, including the transfer facility. See General Statutes § 7-148 (c) (6) (A) (i). We do not say that all such repairs, regardless of their complexity and the level of specialization required, automatically must be considered to be part of the business of a large municipality such as Bridgeport. Indeed, we have explained that the complexity of the work in question is a relevant factor for determining principal employer liability under § 31-291. See *Battistelli* v. *Connohio, Inc.*, supra, 138 Conn. 649 (''it is obvious that the intricate character of the job and the special skill required put it well outside of the capabilities of the defendants' ordinary employees''). On the present record, however, we have no reason to disagree with the conclusion of the commissioner that roof repair is a ''necessary and expected part'' of the routine building maintenance of the city's transfer facility. *Pacileo* v. *Morganti, Inc.*, supra, 264. It does not appear that the roof repairs at issue were so complex or demanded such specialized skills that they fell outside of the business of the city, which employs a variety of tradespeople—including electricians, carpenters, plumbers, painters, and masons—but which elected not to employ its own roofers for financial reasons.[11] Because the city chose not to employ roofers of its own, it was required to contract for roofing services, making the

_____

vant to determining the principal employer status of a private business in *Pacileo* should be excluded from consideration as part of the same inquiry for a public employer.

[11] The range of skilled tradespeople employed by the city reveals the flaw in the city's argument that it cannot be the plaintiff's principal employer because it is not in the business of roofing. The city also is not ''in the business'' of masonry, plumbing, carpentry, painting, or electrical work, yet it employs individuals skilled in each of these trades because the business of the city requires it to manage, maintain, and repair a wide range of public facilities, including its transfer facility.

Barker *v.* All Roofs by Dominic

utilization of roofers, such as the plaintiff, a part or process in the city's business of maintaining and repairing the transfer facility.

Predicating principal employer liability on the actual employment of workers who perform the type of work at issue also would be inconsistent with the remedial purpose of § 31-291. As we previously have stated, "the purpose of the principal employer provision in § 31-291 is to afford full protection to work[ers], by preventing the possibility of defeating the [Workers' Compensation Act] by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 307, 140 A.3d 950 (2016). The statute "protect[s] employees of minor contractors against the possible irresponsibility of their immediate employers. . . . Otherwise, [§ 31-291], and, indeed, the whole policy of the [Workers'] Compensation Act, might be evaded by the device of the owner parceling out the work of construction among a number of separate [uninsured] contractors . . . ." (Internal quotation marks omitted.) *Johnson* v. *Mortenson*, supra, 110 Conn. 226. The defendants' interpretation of the statute would allow employers to do precisely what the statute was enacted to prohibit—avoid liability under the Workers' Compensation Act by choosing to hire contractors rather than employees to perform certain tasks.

The defendants contend that their position finds support in *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 189, the holding of which they say implies that the "repair or alteration" of a building is not a part or process in an employer's trade or business. The defendants construe our holding in *Fox* too broadly. In that case, the plaintiff, Richard Fox, was an employee of a window washing company that the defendant, Fafnir Bearing Company (Fafnir), had hired to wash the windows in its factory. Id., 190. Fafnir was "in the business of manu-

Barker *v.* All Roofs by Dominic

facturing ball bearings,'' but ''it was necessary to have
the windows washed, as a clean and attractive condition
of the factory was an advertising asset of the corpo-
ration.'' Id., 191. On appeal, Fafnir claimed that it was
not Fox' principal employer because ''the washing of
windows by [Fox] was not 'a part or process in [its]
trade or business . . . .' '' Id., 192. We disagreed, rea-
soning that ''[a]ny work which was an essential part of
the maintenance and operation of its factory was a part
of its 'trade or business,' though not a process in the
actual work of manufacturing ball bearings. . . . [Fox']
work of window-washing was work which had to do
with the maintenance of the factory buildings in good
condition for the manufacturing processes there con-
ducted, and which could fairly be said to be essential
for that purpose—work similar in character to that of
scrubbing the floors, cleaning the offices and ordinary
janitor work. Such work is customarily done by regu-
lar employees in the daily routine of their duties in the
factory. It is clearly distinguishable from work done in
connection with the repair or alteration of the factory
buildings. It is a part of the work of keeping the employ-
er's factory in running condition, and therefore a part
of its 'trade or business' though not directly connected
with any manufacturing process. To limit the applica-
tion of [the principal employer statute] to work done
in the actual process of manufacture would be to adopt
a construction not required or permitted by the lan-
guage of the [Workers' Compensation] Act, and entirely
at variance with our settled policy of construing the
[Workers'] Compensation Act broadly in order to effec-
tuate its purpose.'' Id., 195–96.

Although the thrust of the analysis in *Fox* supports
the conclusion we reach here, the defendants contend
that the language distinguishing ordinary maintenance
work, such as washing windows, from ''work done in
connection with the repair or alteration of the factory

Barker *v.* All Roofs by Dominic

buildings''; id., 195; requires a different outcome in the present case because it involves a roof repair. The defendants' position, however, overlooks the most fundamental observation made in *Fox*, which is that "[n]o general rule [for determining the scope of the employer's trade or business for purposes of principal employer liability] is deducible from the authorities, and it is often a matter of extreme difficulty to decide whether the work in a given case falls with the designation of the statute. It is in each case largely a question of degree and of fact . . . .'' Id., 194. A categorical distinction between maintenance and repair is not helpful in this context, and we do not read *Fox* to establish such a distinction as a doctrinal matter. The determination in any particular case as to whether the nature and extent of the work being performed by the plaintiff should be deemed a part of the defendant's business operations or outside of those business operations will depend on the specific facts of the case viewed in light of the factors previously discussed in this opinion. In the present case, the commissioner reasonably concluded that the repair of the transfer facility's roof was a part or process in the city's business on the basis of the evidence concerning the city's business operations, its statutory responsibilities, and the nature and scope of the maintenance and repair work ordinarily performed by city employees.[12]

---

[12] The defendants also point to our decision in *Grenier* v. *Grenier*, supra, 138 Conn. 569, in support of their argument that roof repairs cannot be a part or process in the city's business. In *Grenier*, the plaintiff was injured while working for a contractor hired to install weatherproofing material on a new roof being constructed by another contractor as part of a major renovation of a three-story building owned by a car dealership. Id., 570. We upheld the commissioner's finding that the plaintiff's work was not a part or process in the trade or business of the dealership. Id., 572. We reject the defendants' contention that there is "no distinction" between *Grenier* and the present case. To the contrary, we believe that the commissioner in the present case was entitled to see a substantial difference between the major capital improvement undertaken by the automobile dealership in *Grenier* and the repair of an existing roof on the city's transfer station at issue here.

Barker *v.* All Roofs by Dominic

The defendants contend, in a similar vein, that roof repair is not a part or process in the city's trade or business because the city did not supply the plaintiff with tools or materials or oversee the plaintiff's work. This argument suffers from the same defect as the previous one. Like the hiring of employees, the source of the tools or materials used for the work, although relevant to the principal employer inquiry, is not a dispositive consideration. We have upheld findings of principal employer liability without making reference to which party supplied tools and materials or oversaw the work in question. See *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 193, 196–97 (finding no error in trial court's directions to jury on part or process element without making reference to whether defendant supplied tools or materials or directly oversaw work); *Fox* v. *Fafnir Bearing Co.*, supra, 107 Conn. 194–96 (upholding commissioner's conclusion that defendant was principal employer without making reference to whether defendant supplied tools or materials or directly oversaw work); see also *Hebert* v. *RWA, Inc.*, 48 Conn. App. 449, 454–55, 709 A.2d 1149 (upholding commissioner's finding that work was part or process in trade or business of principal employer without making reference to whether principal employer supplied tools and materials or directly oversaw work), cert. denied, 246 Conn. 901, 717 A.2d 239 (1998); *Pacileo* v. *Morganti, Inc.*, supra, 10 Conn. App. 264–65 (no genuine issue of material fact as to whether defendant was principal employer, although no reference was made to whether defendant supplied tools or materials or directly oversaw work).[13]

[13] In *Mancini* and *Hebert*, the court made reference to supervision of the work site by the principal employer when discussing control of the premises. See *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 200; *Hebert* v. *RWA, Inc.*, supra, 48 Conn. App. 454. Control of the premises is a separate element of the principal employer analysis, distinct from the trade or business inquiry. See *Crane* v. *Peach Bros.*, supra, 106 Conn. 113 ("[t]o render a principal employer liable, it is clear [that] this statute requires (1) that the relation of principal employer and contractor must exist in work wholly or in part for the former, (2) that the work must be in, on or about premises

Barker *v.* All Roofs by Dominic

In the alternative, the defendants ask us to overrule *Massolini* insofar as it applies principal employer liability to municipalities. The defendants argue that the definition of "business" in *Massolini* is outdated and cite a 2003 dictionary to support their claim that the term "business" means a "commercial or mercantile activity engaged in as a means of livelihood: trade, line," a "commercial or sometimes an industrial enterprise," or "dealings or transactions [especially] of an economic nature . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 167. We decline to overrule *Massolini* for two reasons. First, "[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning, as evidenced in dictionaries in print *at the time the statute was enacted*." (Emphasis added.) *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017); see also *Sandifer* v. *United States Steel Corp.*, 571 U.S. 220, 227, 134 S. Ct. 870, 187 L. Ed. 2d 729 (2014) ("[i]t is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, *contemporary*, common meaning" (emphasis added; internal quotation marks omitted)).[14] We attribute no persuasive value to the defendants' preferred definition of business, taken from a dictionary published ninety years after the enactment of the principal employer statute.

Second, our adherence to this court's holding in *Massolini* gains additional force from the doctrine of stare decisis. "This court has repeatedly acknowledged the

controlled by the principal employer, and (3) that the work be a part or process in the trade or business of the principal employer").

[14] In doing so, we also acknowledge the wisdom found in Judge Learned Hand's cautionary note that a dictionary will not always provide the very best resource for determining the meaning of a word at any particular time. See *Cabell* v. *Markham*, 148 F.2d 737, 739 (2d Cir.) ("it is one of the surest [indices] of a mature and developed jurisprudence not to make a fortress out of the dictionary"), aff'd, 324 U.S. 404, 66 S. Ct. 193, 90 L. Ed. 2d (1945); see also *United States* v. *Costello*, 666 F.3d 1040, 1043–44 (7th Cir. 2012).

Barker *v.* All Roofs by Dominic

significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law. . . . The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Citation omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). "Moreover, [i]n evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do." (Internal quotation marks omitted.) Id., 519–20. The Workers' Compensation Act includes municipalities within the definition of employer; General Statutes § 31-275 (10) (" '[e]mployer' means any person, corporation, limited liability company, firm, partnership, voluntary association, joint stock association, the state and *any public corporation within the state using the services of one or more employees for pay*" (emphasis added)); and the term "principal employer" has been construed to encompass municipalities for more than eighty years.[15] The holding and impli-

_____

[15] "Public corporations have always been included within the scope of our [Workers' Compensation Act], no doubt because there is no substantial reason why their employees should be treated differently than employees in private industry. . . . [P]ublic corporation as used in § 31-275 (10) . . . signifies corporations organized for a public purpose such as municipalities and counties. . . . [T]his interpretation is consistent with the legislative history . . . . During the committee hearings on the bill that became chapter 138 of the 1913 Public Acts, [P]rofessor Willard C. Fisher, an economist at Wesleyan University who had been engaged by the standing committees on judiciary and labor to assist in drafting the act, remarked that the law ought to be as wide as possible in its scope; there ought to be no employment left out that can practically be included. . . . Fisher stated further that there is no good reason for excluding employment of public corporations . . . truly public corporations, the state, the city and the like." (Citations omitted; internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 431–32, 994 A.2d 1265 (2010).

Barker *v.* All Roofs by Dominic

cations of *Massolini* and its progeny have by now become embedded as part of our workers' compensation law, and we are unwilling to overturn established doctrine and upset settled expectations under these circumstances.

The defendants seek to strengthen their argument in favor of doctrinal modification by asserting that the 1959 expansion of the fund has "displaced" *Massolini* because the availability of the fund has eliminated the need to hold municipalities liable as principal employers. The defendants point out that the fund did not exist when *Massolini* was decided and suggest that *Massolini* would have been decided differently if the fund had existed at the time. They hypothesize that, because the existence of the fund means that the injured worker is no longer left uncompensated in these circumstances— that is, the fund would be obligated to pay the plaintiff's compensation award if the city is not found to be the plaintiff's principal employer—it is no longer necessary to apply the principal employer statute to the city under *Massolini*. We are not persuaded.

To begin with, nothing in the language of the statute establishing the fund suggests a legislative intent to abrogate *Massolini* or to alter the standards of principal employer liability. The legislature created the fund in 1945 to encourage employers to hire employees with preexisting disabilities or injuries. See Public Acts 1945, No. 188; *Cece* v. *Felix Industries, Inc.*, 248 Conn. 457, 462–63, 728 A.2d 505 (1999). In 1959, the legislature expanded the role of the fund by requiring it to pay an award of comppensation whenever an injured employee's employer or the employer's insurer did not pay. See Public Acts 1959, No. 580, § 13. Today, this provision is codified at § 31-355.[16] Section 31-355 is silent on the matter of principal employer liability. The defendants

[16] See footnote 3 of this opinion.

Barker *v.* All Roofs by Dominic

have failed to identify any ambiguity in the relevant statutes or statutory scheme that would prompt us to consider their argument for modification; nor have they provided any evidence suggesting that the legislature contemplated making any change to the meaning or scope of principal employer liability or otherwise relieving municipalities of principal employer liability through the fund.

The defendants' argument also misapprehends the role of the fund in our workers' compensation scheme. A primary purpose of the fund is to act as a backstop, ensuring that injured workers receive compensation when the employer has "failed, neglected, refused, or is unable to pay . . . ." General Statutes § 31-155 (b). The fund is a payer of last resort; its existence does not relieve employers or principal employers of their obligations to pay under the Workers' Compensation Act. See General Statutes § 31-355 (c) ("[t]he employer and the insurer, if any, shall be liable to the state for any payments made out of the fund").

Finally, the defendants argue that the commissioner violated § 31-286a (c) by finding the city liable as the plaintiff's principal employer "solely because" it had not met its statutory obligation under § 31-286a (a) to ensure that its contractors were in compliance with the workers' compensation insurance requirements. We declined to grant certification on this issue and do not address the claim. See, e.g., *Bellemare* v. *Wachovia Mortgage Corp.*, 284 Conn. 193, 195 n.2, 931 A.2d 916 (2007).

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, McDONALD and VERTEFEUILLE, Js., concurred.

Barker *v.* All Roofs by Dominic

ROBINSON, C. J., with whom KAHN and ELGO, Js., join, dissenting. I respectfully disagree with the majority's conclusion that, under General Statutes § 31-291,[1] the defendant city of Bridgeport (city)[2] was the "principal employer" liable to pay benefits under the Workers' Compensation Act (act), General Statutes § 31-275 et seq., to the plaintiff, Christopher Barker, an employee of an uninsured roofing subcontractor who was injured while repairing the roof of the city's municipal waste transfer facility. I agree with the majority's threshold conclusions that (1) this court's decision in *Massolini* v. *Driscoll*, 114 Conn. 546, 159 A. 480 (1932), remains good law for the proposition that a municipality can be a principal employer under the act, and (2) the vitality of *Massolini* has not been affected by subsequent developments in workers' compensation law, including the 1959 expansion of the coverage responsibilities of the Second Injury Fund (fund). See Public Acts 1959, No. 580, § 13. I nevertheless part company with the majori-

[1] General Statutes § 31-291 provides: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee or his dependent under the provisions of section 31-293 to recover damages resulting from personal injury or wrongful death occurring on or after May 28, 1988, unless such principal employer has paid compensation benefits under this chapter to such injured employee or his dependent for the injury or death which is the subject of the action."

[2] The defendants in the matter are (1) the city, (2) the city's insurer, PMA Insurance Company (PMA), (3) the city's contractor, All Roofs by Dominic, and (4) the subcontractor and the plaintiff's employer, Howard Adams d/b/a Howie's Roofing. Once the Workers' Compensation Commissioner determined that the plaintiff's employer was uninsured, the Second Injury Fund (fund) became obligated to pay the plaintiff's compensable claim and participated in this case. See General Statutes § 31-355 (h). Only the fund, the city, and PMA are participating in this appeal. Like the majority, I refer to the fund by name and to the city and PMA collectively as the defendants.

Barker *v.* All Roofs by Dominic

ty's application of *Massolini* and its progeny to affirm
the judgment of the Appellate Court affirming the deci-
sion of the Compensation Review Board (board). See
*Barker* v. *All Roofs by Dominic*, 183 Conn. App. 612,
623, 193 A.3d 693 (2018). Specifically, I disagree with
the majority's reliance on a municipality's statutory
power to "[e]stablish, lay out, construct, reconstruct,
alter, maintain, repair, control and operate . . . gar-
bage and refuse disposal facilities . . . and any and
all buildings or facilities necessary or convenient for
carrying on the government of the municipality"; Gen-
eral Statutes § 7-148 (c) (6) (A) (i); to conclude that
the city is in the "business" of repairing the roofs of
municipal buildings. I believe that an unduly heavy
focus on municipalities' broad statutory powers under
§ 7-148 (c) poses the risk of rendering them the guaran-
tor of the workers' compensation obligations of any pri-
vate contractor that they engage, even in cases in which
the municipality has historically chosen not to engage
in that contractor's business. Instead, I conclude that
the city was not in the business of roofing because it
had continuously outsourced that trade to the private
sector, it did not have a roofer on its payroll, and there
was no evidence that its employees had worked along-
side the plaintiff on the transfer station roof project.
Accordingly, I respectfully dissent.

I begin by noting my agreement with the majority's
statement of the background facts, procedural history,
and standard of review. See, e.g., *Graham* v. *Olson
Wood Associates, Inc.*, 323 Conn. 720, 731–32, 150 A.3d
1123 (2016). I also agree with the majority's view of the
law in this area generally, namely, that the "purpose of
the act is to provide compensation for injuries arising
out of and in the course of employment, regardless of
fault. . . . Under the statute, the employee surrenders
his right to bring a [common-law] action against the
employer, thereby limiting the employer's liability to

Barker *v.* All Roofs by Dominic

the statutory amount. . . . In return, the employee is compensated for his or her losses without having to prove liability.'' (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 304, 140 A.3d 950 (2016).

''The first sentence of § 31-291 embodies the 'principal employer doctrine,' under which an employer that hires a contractor or subcontractor, and meets the statutory definition of a 'principal employer,' is liable to pay workers' compensation benefits to the injured employees of those contractors or subcontractors. . . . Furthermore, if the principal employer actually pays those benefits, according to the second sentence of § 31-291, it enjoys immunity from further claims by the injured employees brought under [General Statutes] § 31-293.'' (Citation omitted; footnote omitted.) Id., 303–304. ''The principal employer provision has been part of the act since its enactment in 1913.''[3] Id., 307. ''We have previously stated that the purpose of the principal employer provi-

---

[3] ''Prior to 1988, however, § 31-291 did not require the contractor to actually pay workers' compensation benefits to the injured employees in order to obtain immunity. . . . So long as the employer was a principal employer— and, thus, was *liable* to pay the benefits—the employer enjoyed immunity from civil actions regardless of whether it *actually paid* those benefits.'' (Citation omitted; emphasis in original.) *Gonzalez* v. *O & G Industries, Inc.*, supra, 322 Conn. 307. The benefits provided by the fund and certificates of insurance provided by subcontractors created an ''inequitable situation'' because the principal employer received immunity, even though it was ''rarely'' required to pay workers' compensation benefits. (Internal quotation marks omitted.) Id. Accordingly, in 1988, ''the legislature amended § 31-291 to require principal employers to actually pay workers' compensation benefits in order to obtain the statutory immunity from civil actions.'' Id., 307–308. ''[T]he purpose and effect of this amendment was to limit the implied common-law immunity of the principal employer to the situation in which it had *in fact* paid the workers' compensation benefits that presumably were the basis of its immunity. Implicit in this amendment, moreover, was the notion that, except in the *isolated cases* of its application, there would be *no such immunity*.'' (Emphasis in original; internal quotation marks omitted.) Id., 308; see also *Sgueglia* v. *Milne Construction Co.*, 212 Conn. 427, 434–35, 562 A.2d 505 (1989) (discussing principal employer's obligation under General Statutes § 31-355 to reimburse fund for benefits paid).

Barker *v.* All Roofs by Dominic

sion in § 31-291 is to afford full protection to work[ers], by preventing the possibility of defeating the [act] by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work.'' (Internal quotation marks omitted.) Id.

It is well settled that the ''three conditions that must exist for [an entity] to qualify as a principal employer are: (1) the relation of principal employer and contractor must exist in work wholly or in part for the former; (2) the work must be on or about premises controlled by the principal employer; [and] (3) the work must be a part or process in the trade or business of the principal employer.'' (Internal quotation marks omitted.) Id., 303 n.13. I agree with the majority that this case turns on the third element of the test, namely, whether roof repair was ''a part or process in the trade or business'' of the city. ''When applied to a public corporation, the term [business] signifies the conduct of the usual affairs of the corporation, and such as commonly engage the attention of its officers.'' *Massolini* v. *Driscoll*, supra, 114 Conn. 552; see *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 195–96, 355 A.2d 32 (1974).

The ''leading case'' from this court expounding on the third element of the principal employer test is *King* v. *Palmer*, 129 Conn. 636, 30 A.2d 549 (1943). *Gedeon* v. *First National Supermarkets, Inc.*, 21 Conn. App. 20, 26 n.2, 571 A.2d 123, cert. denied, 215 Conn. 804, 574 A.2d 220 (1990); see also R. Carter et al., 19 Connecticut Practice Series: Workers' Compensation Law (Supp. 2019–2020) § 2.32, pp. 89–90 (describing ''the *King* test [as] ubiquitously applied'' and ''the classic statement and analysis of the law in Connecticut''). In *King*, a steamfitter, who was employed by an independent company that had been ''engaged in replacing and reconstructing the entire heating and steam pressure system of [a railroad company's] enginehouse,'' brought a negligence action to recover for injuries he sustained when

Barker *v.* All Roofs by Dominic

he was struck by a truck operated by the railroad's
employees. *King* v. *Palmer*, supra, 637. In considering
whether the railroad was statutorily immune from liabil-
ity because it was the steamfitter's principal employer,
the court focused on the "determinative" third element
of the three factor test, observing that it had "never
attempted to define by a general statement the intent
expressed by the legislature in its use of the words 'part
or process in the trade or business' of the principal
employer and [had] in fact in [its] opinions on one or
two occasions suggested that it would be difficult to
do so." Id., 639. Putting aside the "part" portion of the
principal employer statute,[4] the court observed that its
past cases had "in effect . . . held that the words 'pro-
cess in the trade or business' included all those opera-
tions [that] entered directly into the successful perfor-
mance of the commercial function of the principal
employer," citing routine window washing of a factory
in *Fox* v. *Fafnir Bearing Co.*, 107 Conn. 189, 193, 139
A. 778 (1928), "the placing of the calks in the shoes of
horses by a driver engaged in collecting ashes for a
city [that] had contracted out the performance of that
function" in *Massolini* v. *Driscoll*, supra, 114 Conn. 546,
"and the removal of rubbish in connection with the
operation of a store" in *Hoard* v. *Sears Roebuck & Co.*,
122 Conn. 185, 189, 188 A. 269 (1936). *King* v. *Palmer*,
supra, 640–41. The court observed that, "[o]n the other

---

[4] The court stated that it was not concerned with the "part" language of
the statute, deeming it "intended to meet situations, for example, [in which]
a manufacturer of a general line of hats contracts out the production and
distribution of hats of a particular type or [when] a transportation company
contracts out the maintenance and operation of one of its branches. We might
conceivably have construed the words 'process in the trade or business' as
restricted to those situations [in which] a part of the process [that] entered
directly into the production of goods by a manufacturer or the performance
of the business function of a commercial enterprise was contracted out, as,
for example, [when] a manufacturer of optical goods contracted out the
rough grinding of the lenses [that] went into the instruments it produced,
itself doing the polishing and finishing of the lenses, or [when] a mercantile
company contracted out the maintenance and operation of a system for
delivery of its goods." *King* v. *Palmer*, supra, 129 Conn. 640.

Barker *v.* All Roofs by Dominic

hand, [when] the work in which the employee is engaged does not directly enter into the performance of the commercial function of the claimed principal employer but only affords facilities for the conduct of his trade or business, we have held that the work is not a 'process' in that trade or business,'' citing examples such as ''the construction of a factory building . . . and the construction of a partition in a factory . . . .'' (Citation omitted.) Id., 641. Distilling these two lines of cases, the court observed in *King* that, ''[i]f the work is of such a character that it ordinarily or appropriately would be performed by the principal employer's own employees in the prosecution of its business, or as an essential part in the maintenance thereof, it is a part or process of his work.'' Id.

As the Appellate Court has observed, *King* ''sets up the distinction between acts that constitute part or process and acts that do not, based on whether the acts constitute temporary maintenance or major replacement.'' *Gedeon* v. *First National Supermarkets, Inc.*, supra, 21 Conn. App. 26 n.2. ''It has long been held that this condition is not limited to the main tasks performed in the principal employer's trade or business. Rather, those tasks [that] are necessary to the routine functioning of a business are also included within the scope of this element . . . .'' *Alpha Crane Service, Inc.* v. *Capitol Crane Co.*, 6 Conn. App. 60, 75, 504 A.2d 1376, cert. denied sub nom. *Aparo* v. *United Technologies Corp.*, 199 Conn. 807, 508 A.2d 769 (1986), and cert. denied, 199 Conn. 808, 508 A.2d 769 (1986), and cert. denied sub nom. *Aparo* v. *United Technologies Corp.*, 199 Conn. 808, 508 A.2d 769 (1986). Leading commentators observe that ''[t]he shades of gray . . . are numerous in this area,'' but, ''with a surprising degree of harmony, the cases . . . agree [on] the general rule of thumb that the statute covers all situations in which work is accomplished [that] this employer, or employers in a similar business, would ordinarily do through employ-

Barker *v.* All Roofs by Dominic

ees.'' 19 R. Carter et al., supra, § 2.32, p. 89. ''It is the actual practice of the principal employer on which the application of the statute turns.'' *Doyle* v. *Finitsis*, 42 Conn. Supp. 168, 171, 608 A.2d 1191 (1992). This determination ultimately ''is a question of degree and fact.'' *Grenier* v. *Grenier*, 138 Conn. 569, 571, 87 A.2d 148 (1952); see *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950).

Applying this analysis, the court concluded in *King* that the steamfitter was ''not engaged in [a] part or process'' in the railroad's business, and, therefore, his negligence claims were not barred because the railroad was not his principal employer. *King* v. *Palmer*, supra, 129 Conn. 642. The court emphasized that the railroad ''had two employees who were engaged in fixing leaks in the pipes and were continuously busy at that work. This was work that would ordinarily and appropriately be performed by the principal employers in the prosecution of their business and is essential to maintaining it. However, the work out of which the [steamfitter's] injury arose was a major job of replacement of pipes and *not one of their temporary maintenance*, so that the principal employers' business might proceed without interruption.'' (Emphasis added.) Id., 641–42; see id., 638 (noting that steamfitter's work was exclusively supervised by plumbing independent contractor, which had provided all tools he needed for reconstruction job); see also *Grenier* v. *Grenier*, supra, 138 Conn. 570–72 (automobile sales and repair business was not principal employer of roofer who was employed by uninsured roofing company and injured while installing weatherproofing material on wooden roof because roofing work ''was not of such a character that it would ordinarily be performed by the [automobile company's] employees''); *Crisanti* v. *Cremo Brewing Co.*, supra, 136 Conn. 532–33 (beverage manufacturer was principal employer of independent trucking company employee who was injured while loading truck for New York deliveries

because he was ''actually'' working ''in collaboration'' with beverage manufacturer's employees during loading, and beverage manufacturer ''maintained a fleet of trucks operated by its own employees to deliver to its [Connecticut and Massachusetts] customers 80 [percent] of its merchandise,'' rendering it ''just as much a business function of the defendant to deliver its product by one method as by the other''); *Zimmerman* v. *Mac-Dermid, Inc.*, 130 Conn. 385, 388–89, 34 A.2d 698 (1943) (moving ''drums of chemicals from the unloading platform to the place in the factory designated by [the chemical plant's] employee was work [that] would ordinarily be performed by the employees of the [chemical plant],'' rendering chemical plant principal employer of injured delivery company employee); *Alpha Crane Service, Inc.* v. *Capitol Crane Co.*, supra, 6 Conn. App. 76 (The crane operator was a statutory employee of the mechanical and electrical engineering company, which had been engaged to dismantle ductwork at a laboratory, because ''[a] necessary and expected part of that business was that the dismantled ducts had to be lowered to the ground. Thus, the use of cranes such as those operated by [the independent contractors] was a part or process in [the engineering firm's] trade or business.''); *Doyle* v. *Finitsis*, supra, 42 Conn. Supp. 171 (''[T]he actual practice of the bakery was to bake pastries and to sell them. The business of supplying the bakery with flour was . . . not that of its employees but of nonemployees, such as [the injured delivery employee]. The work that [the supplier and its employee] were performing was not [a] part or process of the [bakers'] trade or business.'').

Turning to our principal employer cases involving municipalities, I note that the leading case is *Massolini* v. *Driscoll*, supra, 114 Conn. 546, in which this court held that the city of Hartford was the principal employer of a driver who was employed by an independent con-

Barker *v.* All Roofs by Dominic

tractor that supplied a team of horses to pull a wagon owned by the city and used by city employees to collect refuse. Id., 548–49, 553; see also 19 R. Carter et al., supra, § 2.32, p. 91 (describing *Massolini* as ''[t]he seminal case'' for principal employer liability for municipalities). The driver was killed while applying calks to the shoes of the horses to keep them from slipping, a horse care task that the court described as ''not part of [Hartford's] business'' and ''solely in the interest of [the contractor] and of no benefit to'' Hartford. *Massolini* v. *Driscoll*, supra, 549. Nevertheless, the court held that Hartford was liable to pay workers' compensation benefits as a principal employer because ''the disposal of ashes and rubbish is a 'business,' in which . . . Hartford was engaged at the time of [the] accident'' insofar as the driver had ''been injured on the premises of [Hartford], while employed by a contractor hired by it, and while engaged in doing an act incidental to and in furtherance of the operations involved in the business of'' Hartford. Id., 553. The court emphasized that picking up refuse was part of the exercise of Hartford's ''police powers.'' Id., 552–53. I, however, find most significant the fact that the driver in *Massolini* was working alongside Hartford's own employees at the time of his fatal injury. Id., 548–49.

Similarly illustrative is this court's more recent decision in *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 189, which involved the Metropolitan District, a public corporation authorized by its statutory ''charter . . . to build, create, maintain, alter or repair sewers throughout its district.'' Id., 191. In *Mancini*, the plaintiffs were employees of a construction company that the Metropolitan District had hired to install a sewer line in the town of Rocky Hill; they were injured in an explosion that occurred during the excavation process when one of the plaintiffs struck a dynamite blasting cap with his jackhammer. Id., 191–92. The court held that the Metropolitan District was the plaintiffs' princi-

Barker *v.* All Roofs by Dominic

pal employer, thus barring their negligence claims under § 31-291. Id., 192–93. Specifically, the court held that the trial court had properly instructed the jury with respect to the third element of the test because the fact that the Metropolitan District had used its own employees in addition to private contractors to dig sewers, along with the powers set forth in its charter, rendered the construction of sewers a part or process in its business. Id., 196. The court rejected the plaintiffs' reliance on the absence of evidence that the Metropolitan District "had engaged in blasting when laying sewer lines," rejecting this narrow construction of the act because, "under the terms of the statute, the actual cause of the injury is irrelevant to its applicability. Consequently, the absence of any showing that the [Metropolitan District] engaged in blasting is not fatal to the defense." Id., 195–96. Taking a broad approach to the *King* analysis, the court emphasized that "the 'work' to be performed by [the construction company] for the [Metropolitan District] can be characterized as laying sewer lines," especially "[g]iven that the [Metropolitan District's] charter authorized such construction, and that the plaintiffs' own claims of proof contain the statement that some of the sewers laid on behalf of the [Metropolitan District] were laid by [its own] employees . . . ." Id., 196.

Although I agree with the majority that the city's statutory authorization to engage in the construction and maintenance of municipal buildings is a *relevant* factor in determining whether roofing was a part or process in its business, the sheer breadth of municipal powers under § 7-148 (c), which encompasses nearly every conceivable aspect of running a city,[5] means that

---

[5] For example, subdivision (4) of § 7-148 (c) provides that a municipality may: "(A) Provide for police protection, regulate and prescribe the duties of the persons providing police protection with respect to criminal matters within the limits of the municipality and maintain and regulate a suitable place of detention within the limits of the municipality for the safekeeping of all persons arrested and awaiting trial and do all other things necessary or desirable for the policing of the municipality;

Barker *v.* All Roofs by Dominic

"(B) Provide for fire protection, organize, maintain and regulate the persons providing fire protection, provide the necessary apparatus for extinguishing fires and do all other things necessary or desirable for the protection of the municipality from fire;

"(C) Provide for entertainment, amusements, concerts, celebrations and cultural activities, including the direct or indirect purchase, ownership and operation of the assets of one or more sports franchises;

"(D) Provide for ambulance service by the municipality or any person, firm or corporation;

"(E) Provide for the employment of nurses;

"(F) Provide for lighting the streets, highways and other public places of the municipality and for the care and preservation of public lamps, lamp posts and fixtures;

"(G) Provide for the furnishing of water, by contract or otherwise;

"(H) Provide for or regulate the collection and disposal of garbage, trash, rubbish, waste material and ashes by contract or otherwise, including prohibiting the throwing or placing of such materials on the highways; [and]

"(I) Provide for the financing, construction, rehabilitation, repair, improvement or subsidization of housing for low and moderate income persons and families . . . ."

With respect to public works, sewers, and highways, subdivision (6) of § 7-148 (c) provides in relevant part that a municipality may: "(A) . . . (i) Establish, lay out, construct, reconstruct, alter, maintain, repair, control and operate cemeteries, public burial grounds, hospitals, clinics, institutions for children and aged, infirm and chronically ill persons, bus terminals and airports and their accessories, docks, wharves, school houses, libraries, parks, playgrounds, playfields, fieldhouses, baths, bathhouses, swimming pools, gymnasiums, comfort stations, recreation places, public beaches, beach facilities, public gardens, markets, garbage and refuse disposal facilities, parking lots and other off-street parking facilities, and any and all buildings or facilities necessary or convenient for carrying on the government of the municipality;

"(ii) Create, provide for, construct, regulate and maintain all things in the nature of public works and improvements;

"(iii) Enter into or upon any land for the purpose of making necessary surveys or mapping in connection with any public improvement, and take by eminent domain any lands, rights, easements, privileges, franchises or structures which are necessary for the purpose of establishing, constructing or maintaining any public work, or for any municipal purpose, in the manner prescribed by the general statutes;

"(iv) Regulate and protect from injury or defacement all public buildings, public monuments, trees and ornaments in public places and other public property in the municipality;

"(v) Provide for the planting, rearing and preserving of shade and ornamental trees on the streets and public grounds;

"(vi) Provide for improvement of waterfronts by a board, commission or otherwise;

"(B) . . . (i) Lay out, construct, reconstruct, repair, maintain, operate, alter, extend and discontinue sewer and drainage systems and sewage disposal plants . . . .

\* \* \*

Barker *v.* All Roofs by Dominic

excessive reliance on that factor would render a municipality the workers' compensation guarantor of virtually every employee of an independent contractor engaged by the city.[6] Thus, I afford greater importance to the city's ''actual practice''; *Doyle* v. *Finitsis*, supra, 42

---

"(C) . . . (i) Lay out, construct, reconstruct, alter, maintain, repair, control, operate, and assign numbers to streets, alleys, highways, boulevards, bridges, underpasses, sidewalks, curbs, gutters, public walks and parkways;

''(ii) Keep open and safe for public use and travel and free from encroachment or obstruction the streets, sidewalks and public places in the municipality . . . .

\* \* \*

''(v) Require owners or occupants of land adjacent to any sidewalk or public work to remove snow, ice, sleet, debris or any other obstruction therefrom, provide penalties upon their failure to do so, and cause such snow, ice, sleet, debris or other obstruction to be removed and make the cost of such removal a lien on such property . . . .''

[6] My research reveals that Virginia case law, some of which is cited with approval by the majority, strictly distinguishes governmental entities and public utilities from private sector employers for purposes of the business aspect of its ''statutory employer'' test, which is akin to our principal employer status. In this context, the Virginia Supreme Court has rejected a test akin to that in *King* v. *Palmer*, supra, 129 Conn. 640–41, for private employers, which considered whether the work at issue would ''normally [be] carried on through . . . employees rather than independent contractors,'' describing it as ''not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business, or occupation by their conduct. With regard to such entities, what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

''Yet, public utilities and governmental entities are of another class. It is not simply what they do that defines their trade, business, or occupation. What they are supposed to do is also a determinant. Whereas a private business entity is essentially self-defining in terms of its trade, business, or occupation, a public utility has duties, obligations, and responsibilities imposed [on] it by statute, regulation, or other means.'' (Emphasis omitted; internal quotation marks omitted.) *Ford* v. *Richmond*, 239 Va. 664, 666–67, 391 S.E.2d 270 (1990), quoting *Henderson* v. *Central Telephone Co. of Virginia*, 233 Va. 377, 383, 355 S.E.2d 596 (1987). The court went on to conclude in *Ford* that a contractor's employee who was injured while repairing a roof over a reservoir at a municipal waterworks was a statutory employee of the city of Richmond, which ''was authorized and empowered by legislative mandate to perform certain public duties including . . . the maintenance of a public facility. Under the test applicable to governmental entities, the maintenance work delegated by contract to [the contractor] and performed by its employee, [Curtis E.] Ford, was part of the trade, business or occupation of [Richmond]. As an owner performing such work through an indepen-

Barker *v.* All Roofs by Dominic

Conn. Supp. 171; with respect to its execution of its statutory powers and responsibilities, which renders the present case distinguishable from *Mancini* and *Massolini*.[7]

Specifically, the city's broad menu of powers under § 7-148 (c) is distinct from the sewer line construction

dent contractor, [Richmond] was Ford's statutory employer," and workers' compensation benefits constituted "Ford's exclusive rights and remedies for the injury by accident . . . arising out of and in the course of the employment . . . ." (Citations omitted; internal quotation marks omitted.) *Ford* v. *Richmond*, supra, 669; see *Jones* v. *Commonwealth*, 267 Va. 218, 224–25, 591 S.E.2d 72 (2004) (concluding, without analysis of work of university's employees, that independent contractor injured while performing asbestos abatement at public university was statutory employee of university because of statute charging its "Board of Visitors . . . 'with the care and preservation of all property belonging to the [u]niversity' "); *Roberts* v. *Alexandria*, 246 Va. 17, 19–20, 431 S.E.2d 275 (1993) (holding that city of Alexandria was statutory employer of employee of medical services provider that sheriff had contracted with to provide medical services at city jail because Alexandria "clearly is authorized and empowered [by state statute] to provide medical services to the jail's inmates" and because Alexandria pays costs of operating jail from its general fund revenues).

I note that the Virginia analysis for determining a statutory employer in the governmental context has been criticized as "out of step" with other courts. *Best* v. *Washington Metropolitan Area Transit Authority*, 822 F.2d 1198, 1202 (D.C. Cir.1987) (Mikva, J., concurring); see id. (Mikva, J., concurring) (accepting *Henderson* as binding statement of state law in concluding that independent contractor's employee, who was injured when fixing escalator in subway station, was statutory employee of transit authority because "his employer contracted with a governmental entity [the] broad statutory mandate [of which] appears to embrace escalator repair"); see also *Hose* v. *United States*, 604 F. Supp. 2d 147, 151–52 (D.D.C. 2009) (citing federal cases showing broad application of Virginia law). I agree. With no consideration of a municipality's actual practices, the Virginia approach renders municipalities the guarantor of virtually every employee of any contractor that they engage, particularly given the broad statutory authority of municipalities to act in a variety of areas. I am concerned that the primacy that the majority places on the statutory mandate under § 7-148 (c)—with no evidence that the city ever used its own employees to engage in roofing tasks or to perform actual work alongside the contracted roofers—puts Connecticut on the same path.

[7] I respectfully disagree with the majority's reliance on *Pacileo* v. *Morganti, Inc.*, 10 Conn. App. 261, 522 A.2d 841 (1987). In *Pacileo*, the Appellate Court concluded that a general contractor was the principal employer of an ironworker because "the defendant's business, as the general contractor, was to oversee and implement the construction of the city hall library

Barker *v.* All Roofs by Dominic

and maintenance that were the raisons d'être of the
Metropolitan District in *Mancini*, which the Metropoli-
tan District accomplished in part with its own employ-
ees. *Mancini* v. *Bureau of Public Works*, supra, 167
Conn. 196. In contrast to the driver in *Massolini*, who
drove a team of horses hitched to a city owned wagon
that was staffed by city employees doing the routine
task of refuse collection; *Massolini* v. *Driscoll*, supra,
114 Conn. 548–49; the record in the present case does
not reveal any evidence that the plaintiff was working
alongside any city employees on the transfer station
roof construction project or that the city used its own
employees for roofing tasks at any time. John F. Cottell,
Jr., the city's Deputy Director of Public Facilities[8] who
was the sole witness at the formal hearing before the
Workers' Compensation Commissioner, testified that,
although the city employed other tradespeople, such as
carpenters, electricians, and plumbers, the Bridgeport
Department of Public Facilities did not employ any
roofers because the lack of regular roofing work ren-
dered it more financially advantageous to hire an out-
side contractor when necessary.[9] To Cottell's knowl-

complex. . . . A necessary and expected part of that construction was the
laying of steel rods for the pouring of concrete. Ironworkers generally lay
steel rods. Since none of the individuals directly employed by [the defendant
was] qualified to perform the job of ironworker . . . the utilization of iron-
workers such as the plaintiff was a part or process of the defendant's
trade or business.'' (Internal quotation marks omitted.) Id., 264. A general
construction contractor, who voluntarily undertakes the organization of a
major construction project as a commercial venture, is situated differently
from a municipality that has broad statutory powers in a variety of areas
and makes operational decisions as to the best way to implement those
powers and responsibilities.

[8] As the city's Deputy Director of Public Facilities, Cottell supervised
departmental divisions for roadway maintenance, recycling and sanitation,
the city's municipal garage, and the city's Board of Education facilities, and
also worked with other department heads for divisions such as maintenance
and parks and recreation. He oversaw city employees, as well as the hiring
of relevant contractors.

[9] Cottell testified that the city would hire outside contractors with respect
to the other trades if necessary based on the size of the job, the amount
of time that the job would require, and other working demands on his
department.

Barker *v.* All Roofs by Dominic

edge, the city had never employed a roofer and lacked
the funds to do so. Moreover, the record demonstrates
that the city engaged in only the most fleeting supervi-
sion of the plaintiff's work on this project, with Cottell
testifying that he stopped by the roofing project "at
least once" but that he did not recall seeing the plaintiff
personally.

Put differently, there is no evidence that roofing was
a routine, nonspecialized maintenance task integral
to the day-to-day operations of the Department of Pub-
lic Facilities.[10] Thus, I view this case as more akin to
*Gaspard* v. *Orleans Parish School Board*, 688 So. 2d
1298, 1302–1303 (La. App. 1997), in which the court
held that a school board was not the principal employer
of a plumber, an employee of an independent contractor
who was injured while replacing a school's plumbing
system. In that case, the court observed that the school
board "contracts out specialized work such as a replumb-
ing job," which "was not routine work for the [school
board, which] did not customarily use [its] own employ-

_____

[10] I note that the record is silent as to the city's construction and mainte-
nance practices with respect to its public housing; see General Statutes § 7-
148 (c) (4) (I); and Cottell testified that the Department of Public Facilities
was not responsible for the construction and maintenance of public housing
facilities. Given the importance of a roof to housing, I leave open the possibil-
ity that a city that owns and operates public housing facilities might be akin
to a real estate developer, rendering roofing and related services part of
the business of providing public housing. See *Rodriquez* v. *John Russell
Construction*, 16 Kan. App. 2d 269, 274–75, 826 P.2d 515 (1991) (The court
held that the municipality was the "statutory employer" of a privately
employed roofer who was injured while repairing the roof of a public housing
complex because, when a municipality "becomes involved as a local housing
authority, its trade or business becomes everything inherent to the ownership
and operation of an apartment complex with a large number of tenants.
. . . Roof repair was essential to protect the building and ensure that it
remained habitable."); see also *Mahaffey* v. *United States*, 785 F. Supp.
148, 149–51 (D. Kan. 1992) (United States Army was principal employer of
independent construction contractor's laborer because, "through the Army
Corps of Engineers and the Directorate of Engineering and Housing at Fort
Riley, Kansas, [it was] responsible for designing, constructing, maintaining
and supervising military facilities," rendering "the construction and mainte-
nance of barracks . . . inherent in and an integral part of [the] United
States Army's trade or business").

ees for such jobs.'' Id., 1303. But cf. *Sandhu* v. *State*, Docket No. 1 CA-CV16-0095, 2017 WL 1278982, *3 (Ariz. App. April 6, 2017) (state department of correction was principal employer of dentist employed by independent contractor because, inter alia, it retained control over independent contractor's employees by imposing departmental ''policies and procedures while providing health and dental services,'' and medical care was ''a 'part or process' '' in department's business rather than ''ancillary'' function because ''[t]he provision of medical and dental services to inmates is a routine part of [the department's] business, because Arizona law'' imposes nondelegable duty on department to provide proper care); *Broward County* v. *Rodrigues*, 686 So. 2d 774, 775 (Fla. App.) (maintenance employee of independent contractor injured while cleaning tank at county owned and operated wastewater treatment plant was statutory employee of county because cleaning of tank was necessary to operation of plant, and county passed on all operating costs pursuant to contract with municipalities), cause dismissed, 690 So. 2d 1300 (Fla. 1997); *Joseph* v. *Parish of St. John the Baptist*, 772 So. 2d 737, 738–39 (La. App. 2000) (employee of independent contractor trash hauler was statutory employee of parish, which was legally required to provide garbage collection, nature of work was routine and nonspecialized, parish had personnel capable of performing work, although it did not have equipment at that time, and parish collected refuse removal fees from its residents''); *Clark* v. *Nevada Industrial Commission*, 99 Nev. 729, 730, 669 P.2d 730 (1983) (county was principal employer of temporary poll workers because ''the employment of election workers is clearly within the scope of the county's business of providing governmental services'').

Given these authorities and the record in this case, which indicated that the city had never employed its own roofers at any relevant time and contained no

Barker *v.* All Roofs by Dominic

evidence that city employees worked alongside the plaintiff or other employees of private contractors on the transfer station roof project, I conclude that the city was not in the business of roofing with respect to its public facilities.[11] Accordingly, the city was not the principal employer liable to pay workers' compensation benefits to the plaintiff under § 31-291.

Because I would reverse the judgment of the Appellate Court, I respectfully dissent.

───────────

[11] Although this appeal turns on the third element, namely, whether the city was in the trade or business of roofing, I briefly address the second element of the principal employer test, which concerns whether "the work must be on or about premises controlled by the principal employer . . . ." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, supra, 322 Conn. 303 n.13. I suggest that the historical purpose of the principal employer doctrine is better accomplished when the focus is on authority over the conditions of the workplace at issue rather than on authority over the premises in general, such as that conferred by property ownership. See *Grenier* v. *Grenier*, supra, 138 Conn. 572 ("[t]he special purpose of [the act] is to protect employees of minor contractors against the possible irresponsibility of their immediate employers, by making the principal employer *who has general control of the business in hand* liable as if he had directly employed all who work [on] any part of the business [that] he has undertaken to carry on" (emphasis added; internal quotation marks omitted)); *Wilson* v. *Largay Brewing Co.*, 125 Conn. 109, 112, 3 A.2d 668 (1939) ("[t]he underlying purpose of the restriction as to the place of employment in the various acts was obviously *to limit liability to those situations* [*in which*] *such conditions might be assumed to be largely within the control or observation of the principal employer*" (emphasis added)). This distinction is most readily apparent in considering a general contractor relative to its subcontractors, with the other extreme represented by a homeowner who may, as a matter of law, own or control the premises but hires individuals for home improvement projects because they do not have the expertise or tools to engage in this work safely or competently. This consideration, however, would also likely be reflected in the third "trade or business" element, as well, given its consideration of whether the principal employer's own employees are working alongside the contractor's employees on the project at issue. See *Grenier* v. *Grenier*, supra, 571–72 (criticizing *Bello* v. *Notkins*, 101 Conn. 34, 36–38, 124 A. 831 (1924), which held that homeowner was principal employer of independent contractor employee who was building house for homeowner's own use, and suggesting that decision was driven by fact that homeowner's "business . . . was building houses").