# Appalachian Power Company

## v.

# Greater Lynchburg Transit Company

Record No. 860020

November 18, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Gordon, Retired Justice

*John L. Walker, Jr. (H. Allen Glover, Jr.; William Rosenberger, Jr.; Woods, Rogers & Hazlegrove,* on brief), for appellant.
*David T. Petty, Jr. (Betsy H. Phillips; Kizer, Phillips & Petty,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

As stated by the parties to this appeal, the principal question before us is whether the trial court erred in ruling that a stock corporation wholly owned by a city is a city "installation" within the meaning of a contract between the city and an electric utility.

In a letter dated August 16, 1966, addressed to "City of Lynchburg" (the City), Appalachian Power Company (Apco) submitted a bid for a thirty-year electric franchise. Apco agreed that upon acceptance of its bid, it would

> [M]ake available to the City (applicable to all meter readings subsequent to August 16, 1966) a flat rate for electric energy for its uses . . . of 1¢ per kilowatt hour for all installations of the Water Department and 1 1/2¢ per kilowatt hour for all other installations provided that should any standard tariff be more advantageous for any installation, that it will apply.

In response to that offer, the City enacted an ordinance granting Apco the franchise. At the time the parties entered into this contract, the transit system serving the City was owned and operated by a private concern. In December 1972, the owner of the business notified the City that it intended to discontinue service. The City agreed to purchase the business if it could obtain a federal grant.

The City learned that federal funds were available only if the City agreed to honor the collective bargaining rights of employees of the transit system. The city attorney advised the City that Virginia law forbids a municipality to negotiate a contract with a labor union. Acting upon that advice, the City authorized its attorney to prepare papers creating the Greater Lynchburg Transit Company (GLTC). GLTC was incorporated as a stock corporation effective March 1, 1974. The City became the sole stockholder. GLTC and the labor union executed a contract dated April 4, 1974.

GLTC's application for federal funds was approved, and GLTC used the money to buy all the assets of the transit system. The City retained title to the building used as a "bus barn" but leased the structure to GLTC and to certain other tenants. GLTC then engaged ATE Management and Service Co., Inc. (ATE) to operate the transit system. In turn, ATE created Central Virginia Management Company (Central Virginia), a wholly owned subsidiary, to act as employer in negotiations with transit system employees.

Later, with funds acquired in a federal grant, GLTC purchased two parcels of real estate adjoining the property leased from the City. GLTC planned to demolish the bus barn and construct office buildings and new maintenance shops. As a condition to an additional federal grant to finance the construction, GLTC was required to hold title to the entire tract.

By deed dated January 14, 1983, the City conveyed fee simple title to the bus-barn parcel to GLTC. In a letter of even date, the City's property manager advised GLTC's general manager as follows:

> In conjunction with this conveyance, I am requesting that City utilities currently serving this building be transferred to G.L.T.C. In addition, I request the Public Services Administrator have the power and gas accounts for this building

transferred to the Transit Company name and remove all City materials stored in this building to a new location. For the security of this structure, until demolition, I request the locks be changed on this building's doors and keys to these doors be provided to you.

The City's superintendent of building maintenance wrote a letter the same day instructing Apco to "transfer the electrical service on Accounts . . . [related to the bus barn] from the City of Lynchburg to [GLTC]". The superintendent directed Apco to "read the meters on January 18, 1983, and submit the final bill for service thru this date to the City of Lynchburg." Effective January 18, 1983, Apco submitted to the City its final bill based upon the 1 1/2¢ rate and began billing GLTC at a higher rate described as "the small general service tariff."

GLTC, alleging that it was an "instrumentality" of the City, filed a motion for judgment on October 7, 1983, claiming damages of $13,656.84 as "the excess of the amount received and retained by APCO over the amount APCO is entitled to receive pursuant to its Franchise Agreement . . . of August 16, 1966". In a letter opinion filed at the conclusion of a bench trial, the trial court ruled that the contract was ambiguous on its face and that it would be construed strictly against Apco. Concluding that "G.L.T.C. . . . . possesses all the trappings of an installation of the City", the court entered judgment awarding GLTC damages.

We do not agree that the franchise agreement is facially ambiguous. A written instrument is not ambiguous "merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement." *Wilson* v. *Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984). "We adhere to the 'plain meaning' rule in Virginia." *Berry* v. *Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983). "[T]he language used is to be taken in its ordinary signification . . . . If, when so read, the meaning is plain, the instrument must be given effect accordingly." *Virginian Ry. Co.* v. *Avis*, 124 Va. 711, 716, 98 S.E. 638, 639 (1919).

Construing the language of the franchise agreement quoted above, we think it is plain that special electric rates are "available to the City"; that these rates apply to "all [City] meter readings"; that the special rates apply only to "electric energy for [the City's] uses"; that the 1¢ rate applies to "all installations of the

[City's] Water Department"; and that the 1 1/2¢ rate applies to "all other [City] installations".

■ Unlike the water department, GLTC is not an instrumentality of the City as GLTC alleged in its motion for judgment. The City is a municipality — a governmental entity; GLTC is a stock corporation. While it is true that the City is its sole stockholder, "a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it." *Cheatle* v. *Rudd's Swimming Pool Supply*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987). The City has no contractual relations with GLTC; it has none with ATE, employed by GLTC to operate the transit system; and it has none with ATE's subsidiary, Central Virginia, which serves as the employer of record. If, as GLTC insists, it is an instrumentality of the municipality, then the City arguably would be liable under the doctrine of *respondeat superior* for any breach of duty by GLTC, ATE, or Central Virginia. The city attorney, however, could think of no such case.

The words and deeds of other city officials show that they considered the City and GLTC separate entities. The director of finance acknowledged that, for accounting purposes, the City and GLTC were "separate and distinct". As soon as the City conveyed the bus barn to GLTC, the City's property manager advised GLTC that the public services administrator had been directed to transfer all utility accounts from the City's name to GLTC, that all city property should be removed from the building, and that keys to new locks on the doors should be delivered to GLTC. At the same time, the City's superintendent of building maintenance instructed Apco to transfer the accounts for electric service in the bus barn to GLTC and to read the City's meters and submit a final bill at the special rate. And the city attorney testified that "[t]he City had no interest in [the rate charged] after the transfer of the real estate."

We are of opinion that the trial court erred in concluding that GLTC is an "installation" of the City within the contemplation of the franchise agreement.

Although the issue framed by the parties on brief was whether, as the trial court had ruled, GLTC *itself* was a city installation, counsel for the City took the position in oral argument that a "better rationale" for the trial court's conclusion was that GLTC's "physical plant" was a city installation. Even so, we think that

application of the rationale counsel favors defeats the conclusion the trial court reached.

■ We are concerned here with the meaning of the word "installation" only as it is used in the franchise agreement. The unmistakable import of the word is found in the contextual language. The 1¢ rate applies, not to the water department, but to "all installations of the Water Department". These might include a departmental office building, a water pumping station, or some other departmental facility that consumes electricity. The 1 1/2¢ rate applies to city installations other than those in the water department. Applying the "plain meaning" rule, we hold that the language of the franchise agreement granting special flat rates to the City "for its uses . . . for all installations of the Water Department and . . . for all other installations" means that such rates are available to the City for electricity metered to and consumed by any building or other facility owned by or leased to the City and utilized for a city function.

The evidence shows that GLTC's physical plant does not meet that definition. So long as the City remained the owner and landlord of the bus barn, Apco treated the facility for billing purposes as an "other" city installation. Once GLTC acquired the bus barn, demolished it, and erected replacement buildings, it held fee simple title to the entire physical plant unencumbered by any City interest. And when the City required Apco to transfer the electric account to GLTC and disclaimed further interest in the applicable rate to be charged, the physical plant of the transit system lost its identity as a city installation for purposes of the franchise agreement.*

We will reverse the judgment and enter final judgment in favor of Apco.

*Reversed and final judgment.*

---

* In support of its argument to the contrary, GLTC relies upon the evidence it adduced to show that City Council appoints its board of directors, fixes passenger fares, and subsidizes its operating deficits; that the corporation is exempt from income, real estate, personal-property, and sales taxes; and that the transit system's vehicles use municipal license plates and consume fuel purchased at city pumps. Although such evidence reflects a continuing relationship between the City and the corporation, it is irrelevant to the question whether GLTC or its physical plant constitutes an "installation" of the City within the intendment of the franchise agreement.