Mary J. Ford, Administrator of the
Estate of Curtis E. Ford

v.

City of Richmond

Record No. 890786

April 20, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting and Lacy, JJ.,
and Poff, Senior Justice

*Robert E. Hawthorne* for appellant.
*Stephen C. Conte (White, Blackburn & Conte*, on brief), for appellee.

SENIOR JUSTICE POFF delivered the opinion of the Court.

We granted this appeal to review a judgment dismissing a wrongful-death action. The trial court ruled that the plaintiff's exclusive remedy was a claim under the Workers' Compensation Act. We must decide whether, as the court concluded, a municipality that engaged a contractor to replace a roof on one of its facilities was the statutory employer of the contractor's employee who lost his life in the performance of the contract.

We look to the statement of facts as stipulated by the parties and approved by the trial court. As expressly authorized by the charter granted by the General Assembly and by the city code, "the City of Richmond . . . owned, maintained, repaired and operated Byrd Park Reservoir" as part of "a waterworks system . . . supplying water to the inhabitants of the City". In a contract awarded by the City, Single Ply Systems, Inc., agreed to replace the roof over the reservoir. In the performance of that contract, Curtis E. Ford, one of the contractor's employees, "fell through the vent on the roof . . . and died as a result of said fall."

Mary J. Ford, the decedent's widow and the personal representative of his estate, filed a motion for judgment against the City

and others[1], claiming damages for wrongful death. The City filed a motion to dismiss "on the grounds that the City was immune from the suit because the sole and exclusive remedy of the estate . . . lay under the Workers' Compensation Act". In a final judgment entered March 30, 1989, the trial court, reversing an earlier ruling, held that "the plaintiff's decedent was a statutory employee of the defendant [City]" and sustained the motion to dismiss for want of subject-matter jurisdiction.

■ As stated by Ford, the "question to be resolved is whether or not construction of a new roof for the Byrd Park Reservoir is part of the trade, business or occupation of the City of Richmond in operating its water system." The trial judge ruled that *Henderson* v. *Centel Telephone Co.*, 233 Va. 377, 355 S.E.2d 596 (1987), "controls the case at bar."

■ In *Henderson*, we were asked to determine whether a public utility (Centel) that engaged an independent contractor to install telephone equipment was the statutory employer of the contractor's employee who was injured in the performance of the contract. Urging the negative and citing the test adopted in *Shell Oil Co.* v. *Leftwich*, 212 Va. 715, 187 S.E.2d 162 (1972), the employee argued that he was not engaged in Centel's trade, business, or occupation because the installation of equipment was not work "*normally* carried on through [Centel's] employees rather than independent contractors." 233 Va. at 382, 187 S.E.2d 167 (quoting from Larson, The Law of Workmen's Compensation § 49.12, with emphasis supplied). Rejecting the employee's argument, we held that the statutory-employer test applied generally to private business entities differs from that applied to governmental entities. Explaining the difference, we said:

> The *Shell Oil Co.* test has never been applied by this Court in a case involving either a public utility or a governmental entity. This is so for good reason. The test is merely an approach that is useful in determining an entity's trade, business, or occupation. It is not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business, or occupation by their conduct. With regard to such entities, what they do

---

[1] The other defendants, dismissed on special pleas, were not named as parties to the plaintiff's appeal.

on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

Yet, public utilities and governmental entities are of another class. It is not simply what they do that defines their trade, business, or occupation. What they are supposed to do is also a determinant. Whereas a private business entity is essentially self-defining in terms of its trade, business, or occupation, a public utility has duties, obligations, and responsibilities imposed upon it by statute, regulation, or other means. Such is the case here.

233 Va. at 383, 355 S.E.2d at 599-600.

■ We based our legal conclusion in *Henderson* upon precedents factually similar to the case at bar. Noting that "in cases involving government entities, we have consistently considered the laws under which they were created and under which they functioned in determining their trade, business, or occupation", *id.* at 383-84, 355 S.E.2d at 600, we reviewed the facts underlying our decisions in *Williams* v. *Gresham Company*, 201 Va. 457, 111 S.E.2d 498 (1959), and in *Anderson* v. *Construction Company*, 201 Va. 266, 110 S.E.2d 396 (1959), *appeal dismissed*, 363 U.S. 719 (1960).

In *Williams*, the Chesapeake Bay Ferry District engaged an independent contractor to repair damaged piles. Williams, a Ferry District employee injured while working with the contractor, filed a negligence suit against the contractor. Williams contended that the exclusive-remedy provisions of the Workers' Compensation Act did not bar his tort action because, he insisted, "*maintenance* of [Ferry District's] facilities is not a part of its trade, business or occupation within the meaning of the Act." 201 Va. at 464, 111 S.E.2d at 503 (emphasis added). The trial court disagreed. Upholding the trial court's ruling, we said:

Ferry District Commission was authorized and empowered by the Act creating it . . . to acquire, construct, operate, and maintain a project to provide vehicular and passenger ferry service . . . and to enter into any contracts necessary or incidental to the performance of its duties . . . . When repairs were being made to the ferry slip and the unfortunate accident occurred, Ferry District was executing essential duties imposed upon it."

*Id.* at 464-65, 111 S.E.2d at 503.

In *Anderson,* an employee of a construction company engaged by the Richmond-Petersburg Turnpike Authority to build the turnpike was injured in the course of his duties supervising the work. The act creating the Authority empowered it "to construct, *maintain,* repair and operate the turnpike project." 201 Va. at 268, 110 S.E.2d at 397 (emphasis added). Affirming the trial court's decision, we held that the contractor's employee was a statutory employee of the Authority. Quoting from the trial court's opinion, we explained:

"In a very real sense, the Authority was engaged at every step of the way, in the course of its usual trade, business or occupation, from the preliminary surveys, through the acquisition of the right of way, the construction, and the final operation, maintenance and repair of the turnpike. The Legislature has so declared by vesting it with the power and charging it with the responsibility of so doing."

*Id.* at 272, 110 S.E.2d at 400.

■ Attacking the trial court's reliance on *Henderson,* Ford argues that the decision in that case merely "extended the holding in *Anderson . . .* to include telephone companies and other single purpose public utilities." Ford urges us to hold that "[t]he term 'governmental entity' referred to in *Henderson* does not include local governments". But we have used the term routinely to include municipalities. *See, e.g., Edwards* v. *City of Portsmouth,* 237 Va. 167, 172, 375 S.E.2d 747, 750 (1989); *Appalachian Power* v. *Greater Lynchburg Transit,* 236 Va. 292, 296, 374 S.E.2d 10, 12 (1988).

Next, Ford cites three cases in each of which an injured worker's compensation claim against a municipality was denied: *Bamber* v. *City of Norfolk,* 138 Va. 26, 121 S.E. 564 (1924); *City of Portsmouth* v. *Daniels,* 157 Va. 614, 162 S.E. 324 (1932); *Board of Supervisors* v. *Boaz,* 176 Va. 126, 10 S.E.2d 498 (1940). Ford maintains that "these cases are still controlling" because *Anderson,* upon which *Henderson* relied, "did not reverse *Bamber* since *Bamber* was distinguished along with *Daniels* and *Boaz.*"

■ We agree that *Anderson* did not overrule the holdings in those cases. The holding in *Anderson* was different, not because

the case was factually different, but because *Anderson* was legally distinguishable. Case law construing a statute is controlling precedent only until the General Assembly "effects a substantive change in the law." *State Farm* v. *Major*, 239 Va. 375, 378, 389 S.E.2d 307, 309 (1990). In the 19 years between *Boaz* and *Anderson*, the General Assembly amended the Workers' Compensation Act in several material particulars.

As the trial court recognized, *Henderson* construed the Act as amended. The *Williams-Anderson* rationale invoked and applied there is equally applicable here. Like the public utility in *Henderson*, the ferry district in *Williams*, and the turnpike in *Anderson*, the City of Richmond was authorized and empowered by legislative mandate to perform certain public duties including, in each case, the maintenance of a public facility. Under the test applicable to governmental entities, the maintenance work delegated by contract to Single Ply Systems and performed by its employee, Ford, was part of the "trade, business or occupation" of the City. As an owner performing such work through an independent contractor, the City was Ford's statutory employer, Code § 65.1-29, and Ford's exclusive rights and remedies for the "injury by accident . . . arising out of and in the course of the employment", Code § 65.1-7, were those granted by the Act, Code § 65.1-40.

Accordingly, we will uphold the trial court's ruling and affirm the judgment entered below.

*Affirmed.*