******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ROBINSON, C. J., with whom KAHN and ELGO, Js., join, dissenting. I respectfully disagree with the majority's conclusion that, under General Statutes § 31-291,[1] the defendant city of Bridgeport (city)[2] was the "principal employer" liable to pay benefits under the Workers' Compensation Act (act), General Statutes § 31-275 et seq., to the plaintiff, Christopher Barker, an employee of an uninsured roofing subcontractor who was injured while repairing the roof of the city's municipal waste transfer facility. I agree with the majority's threshold conclusions that (1) this court's decision in *Massolini* v. *Driscoll*, 114 Conn. 546, 159 A. 480 (1932), remains good law for the proposition that a municipality can be a principal employer under the act, and (2) the vitality of *Massolini* has not been affected by subsequent developments in workers' compensation law, including the 1959 expansion of the coverage responsibilities of the Second Injury Fund (fund). See Public Acts 1959, No. 580, § 13. I nevertheless part company with the majority's application of *Massolini* and its progeny to affirm the judgment of the Appellate Court affirming the decision of the Compensation Review Board (board). See *Barker* v. *All Roofs by Dominic*, 183 Conn. App. 612, 623, 193 A.3d 693 (2018). Specifically, I disagree with the majority's reliance on a municipality's statutory power to "[e]stablish, lay out, construct, reconstruct, alter, maintain, repair, control and operate . . . garbage and refuse disposal facilities . . . and any and all buildings or facilities necessary or convenient for carrying on the government of the municipality"; General Statutes § 7-148 (c) (6) (A) (i); to conclude that the city is in the "business" of repairing the roofs of municipal buildings. I believe that an unduly heavy focus on municipalities' broad statutory powers under § 7-148 (c) poses the risk of rendering them the guarantor of the workers' compensation obligations of any private contractor that they engage, even in cases in which the municipality has historically chosen not to engage in that contractor's business. Instead, I conclude that the city was not in the business of roofing because it had continuously outsourced that trade to the private sector, it did not have a roofer on its payroll, and there was no evidence that its employees had worked alongside the plaintiff on the transfer station roof project. Accordingly, I respectfully dissent.

I begin by noting my agreement with the majority's statement of the background facts, procedural history, and standard of review. See, e.g., *Graham* v. *Olson Wood Associates, Inc.*, 323 Conn. 720, 731–32, 150 A.3d 1123 (2016). I also agree with the majority's view of the law in this area generally, namely, that the "purpose of the act is to provide compensation for injuries arising out of and in the course of employment, regardless of

fault. . . . Under the statute, the employee surrenders his right to bring a [common-law] action against the employer, thereby limiting the employer's liability to the statutory amount. . . . In return, the employee is compensated for his or her losses without having to prove liability." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, 322 Conn. 291, 304, 140 A.3d 950 (2016).

"The first sentence of § 31-291 embodies the 'principal employer doctrine,' under which an employer that hires a contractor or subcontractor, and meets the statutory definition of a 'principal employer,' is liable to pay workers' compensation benefits to the injured employees of those contractors or subcontractors. . . . Furthermore, if the principal employer actually pays those benefits, according to the second sentence of § 31-291, it enjoys immunity from further claims by the injured employees brought under [General Statutes] § 31-293." (Citation omitted; footnote omitted.) Id., 303–304. "The principal employer provision has been part of the act since its enactment in 1913."[3] Id., 307. "We have previously stated that the purpose of the principal employer provision in § 31-291 is to afford full protection to work[ers], by preventing the possibility of defeating the [act] by hiring irresponsible contractors or subcontractors to carry on a part of the [principal] employer's work." (Internal quotation marks omitted.) Id.

It is well settled that the "three conditions that must exist for [an entity] to qualify as a principal employer are: (1) the relation of principal employer and contractor must exist in work wholly or in part for the former; (2) the work must be on or about premises controlled by the principal employer; [and] (3) the work must be a part or process in the trade or business of the principal employer." (Internal quotation marks omitted.) Id., 303 n.13. I agree with the majority that this case turns on the third element of the test, namely, whether roof repair was "a part or process in the trade or business" of the city. "When applied to a public corporation, the term [business] signifies the conduct of the usual affairs of the corporation, and such as commonly engage the attention of its officers." *Massolini* v. *Driscoll*, supra, 114 Conn. 552; see *Mancini* v. *Bureau of Public Works*, 167 Conn. 189, 195–96, 355 A.2d 32 (1974).

The "leading case" from this court expounding on the third element of the principal employer test is *King* v. *Palmer*, 129 Conn. 636, 30 A.2d 549 (1943). *Gedeon* v. *First National Supermarkets, Inc.*, 21 Conn. App. 20, 26 n.2, 571 A.2d 123, cert. denied, 215 Conn. 804, 574 A.2d 220 (1990); see also R. Carter et al., 19 Connecticut Practice Series: Workers' Compensation Law (Supp. 2019–2020) § 2.32, pp. 89–90 (describing "the *King* test [as] ubiquitously applied" and "the classic statement and analysis of the law in Connecticut"). In *King*, a

steamfitter, who was employed by an independent company that had been "engaged in replacing and reconstructing the entire heating and steam pressure system of [a railroad company's] enginehouse," brought a negligence action to recover for injuries he sustained when he was struck by a truck operated by the railroad's employees. *King* v. *Palmer*, supra, 637. In considering whether the railroad was statutorily immune from liability because it was the steamfitter's principal employer, the court focused on the "determinative" third element of the three factor test, observing that it had "never attempted to define by a general statement the intent expressed by the legislature in its use of the words 'part or process in the trade or business' of the principal employer and [had] in fact in [its] opinions on one or two occasions suggested that it would be difficult to do so." Id., 639. Putting aside the "part" portion of the principal employer statute,[4] the court observed that its past cases had "in effect . . . held that the words 'process in the trade or business' included all those operations [that] entered directly into the successful performance of the commercial function of the principal employer," citing routine window washing of a factory in *Fox* v. *Fafnir Bearing Co.*, 107 Conn. 189, 193, 139 A. 778 (1928), "the placing of the calks in the shoes of horses by a driver engaged in collecting ashes for a city [that] had contracted out the performance of that function" in *Massolini* v. *Driscoll*, supra, 114 Conn. 546, "and the removal of rubbish in connection with the operation of a store" in *Hoard* v. *Sears Roebuck & Co.*, 122 Conn. 185, 189, 188 A. 269 (1936). *King* v. *Palmer*, supra, 640–41. The court observed that, "[o]n the other hand, [when] the work in which the employee is engaged does not directly enter into the performance of the commercial function of the claimed principal employer but only affords facilities for the conduct of his trade or business, we have held that the work is not a 'process' in that trade or business," citing examples such as "the construction of a factory building . . . and the construction of a partition in a factory . . . ." (Citation omitted.) Id., 641. Distilling these two lines of cases, the court observed in *King* that, "[i]f the work is of such a character that it ordinarily or appropriately would be performed by the principal employer's own employees in the prosecution of its business, or as an essential part in the maintenance thereof, it is a part or process of his work." Id.

As the Appellate Court has observed, *King* "sets up the distinction between acts that constitute part or process and acts that do not, based on whether the acts constitute temporary maintenance or major replacement." *Gedeon* v. *First National Supermarkets, Inc.*, supra, 21 Conn. App. 26 n.2. "It has long been held that this condition is not limited to the main tasks performed in the principal employer's trade or business. Rather, those tasks [that] are necessary to the routine function-

ing of a business are also included within the scope of this element . . . ." *Alpha Crane Service, Inc.* v. *Capitol Crane Co.*, 6 Conn. App. 60, 75, 504 A.2d 1376, cert. denied sub nom. *Aparo* v. *United Technologies Corp.*, 199 Conn. 807, 508 A.2d 769 (1986), and cert. denied, 199 Conn. 808, 508 A.2d 769 (1986), and cert. denied sub nom. *Aparo* v. *United Technologies Corp.*, 199 Conn. 808, 508 A.2d 769 (1986). Leading commentators observe that "[t]he shades of gray . . . are numerous in this area," but, "with a surprising degree of harmony, the cases . . . agree [on] the general rule of thumb that the statute covers all situations in which work is accomplished [that] this employer, or employers in a similar business, would ordinarily do through employees." 19 R. Carter et al., supra, § 2.32, p. 89. "It is the actual practice of the principal employer on which the application of the statute turns." *Doyle* v. *Finitsis*, 42 Conn. Supp. 168, 171, 608 A.2d 1191 (1992). This determination ultimately "is a question of degree and fact." *Grenier* v. *Grenier*, 138 Conn. 569, 571, 87 A.2d 148 (1952); see *Crisanti* v. *Cremo Brewing Co.*, 136 Conn. 529, 532, 72 A.2d 655 (1950).

Applying this analysis, the court concluded in *King* that the steamfitter was "not engaged in [a] part or process" in the railroad's business, and, therefore, his negligence claims were not barred because the railroad was not his principal employer. *King* v. *Palmer*, supra, 129 Conn. 642. The court emphasized that the railroad "had two employees who were engaged in fixing leaks in the pipes and were continuously busy at that work. This was work that would ordinarily and appropriately be performed by the principal employers in the prosecution of their business and is essential to maintaining it. However, the work out of which the [steamfitter's] injury arose was a major job of replacement of pipes and *not one of their temporary maintenance*, so that the principal employers' business might proceed without interruption." (Emphasis added.) Id., 641–42; see id., 638 (noting that steamfitter's work was exclusively supervised by plumbing independent contractor, which had provided all tools he needed for reconstruction job); see also *Grenier* v. *Grenier*, supra, 138 Conn. 570–72 (automobile sales and repair business was not principal employer of roofer who was employed by uninsured roofing company and injured while installing weatherproofing material on wooden roof because roofing work "was not of such a character that it would ordinarily be performed by the [automobile company's] employees"); *Crisanti* v. *Cremo Brewing Co.*, supra, 136 Conn. 532–33 (beverage manufacturer was principal employer of independent trucking company employee who was injured while loading truck for New York deliveries because he was "actually" working "in collaboration" with beverage manufacturer's employees during loading, and beverage manufacturer "maintained a fleet of trucks operated by its own employees to deliver

to its [Connecticut and Massachusetts] customers 80 [percent] of its merchandise," rendering it "just as much a business function of the defendant to deliver its product by one method as by the other"); *Zimmerman* v. *MacDermid, Inc.*, 130 Conn. 385, 388–89, 34 A.2d 698 (1943) (moving "drums of chemicals from the unloading platform to the place in the factory designated by [the chemical plant's] employee was work [that] would ordinarily be performed by the employees of the [chemical plant]," rendering chemical plant principal employer of injured delivery company employee); *Alpha Crane Service, Inc.* v. *Capitol Crane Co.*, supra, 6 Conn. App. 76 (The crane operator was a statutory employee of the mechanical and electrical engineering company, which had been engaged to dismantle ductwork at a laboratory, because "[a] necessary and expected part of that business was that the dismantled ducts had to be lowered to the ground. Thus, the use of cranes such as those operated by [the independent contractors] was a part or process in [the engineering firm's] trade or business."); *Doyle* v. *Finitsis*, supra, 42 Conn. Supp. 171 ("[T]he actual practice of the bakery was to bake pastries and to sell them. The business of supplying the bakery with flour was . . . not that of its employees but of nonemployees, such as [the injured delivery employee]. The work that [the supplier and its employee] were performing was not [a] part or process of the [bakers'] trade or business.").

Turning to our principal employer cases involving municipalities, I note that the leading case is *Massolini* v. *Driscoll*, supra, 114 Conn. 546, in which this court held that the city of Hartford was the principal employer of a driver who was employed by an independent contractor that supplied a team of horses to pull a wagon owned by the city and used by city employees to collect refuse. Id., 548–49, 553; see also 19 R. Carter et al., supra, § 2.32, p. 91 (describing *Massolini* as "[t]he seminal case" for principal employer liability for municipalities). The driver was killed while applying calks to the shoes of the horses to keep them from slipping, a horse care task that the court described as "not part of [Hartford's] business" and "solely in the interest of [the contractor] and of no benefit to" Hartford. *Massolini* v. *Driscoll*, supra, 549. Nevertheless, the court held that Hartford was liable to pay workers' compensation benefits as a principal employer because "the disposal of ashes and rubbish is a 'business,' in which . . . Hartford was engaged at the time of [the] accident" insofar as the driver had "been injured on the premises of [Hartford], while employed by a contractor hired by it, and while engaged in doing an act incidental to and in furtherance of the operations involved in the business of" Hartford. Id., 553. The court emphasized that picking up refuse was part of the exercise of Hartford's "police powers." Id., 552–53. I, however, find most significant the fact that the driver in *Massolini* was working along-

side Hartford's own employees at the time of his fatal injury. Id., 548–49.

Similarly illustrative is this court's more recent decision in *Mancini* v. *Bureau of Public Works*, supra, 167 Conn. 189, which involved the Metropolitan District, a public corporation authorized by its statutory "charter . . . to build, create, maintain, alter or repair sewers throughout its district." Id., 191. In *Mancini*, the plaintiffs were employees of a construction company that the Metropolitan District had hired to install a sewer line in the town of Rocky Hill; they were injured in an explosion that occurred during the excavation process when one of the plaintiffs struck a dynamite blasting cap with his jackhammer. Id., 191–92. The court held that the Metropolitan District was the plaintiffs' principal employer, thus barring their negligence claims under § 31-291. Id., 192–93. Specifically, the court held that the trial court had properly instructed the jury with respect to the third element of the test because the fact that the Metropolitan District had used its own employees in addition to private contractors to dig sewers, along with the powers set forth in its charter, rendered the construction of sewers a part or process in its business. Id., 196. The court rejected the plaintiffs' reliance on the absence of evidence that the Metropolitan District "had engaged in blasting when laying sewer lines," rejecting this narrow construction of the act because, "under the terms of the statute, the actual cause of the injury is irrelevant to its applicability. Consequently, the absence of any showing that the [Metropolitan District] engaged in blasting is not fatal to the defense." Id., 195–96. Taking a broad approach to the *King* analysis, the court emphasized that "the 'work' to be performed by [the construction company] for the [Metropolitan District] can be characterized as laying sewer lines," especially "[g]iven that the [Metropolitan District's] charter authorized such construction, and that the plaintiffs' own claims of proof contain the statement that some of the sewers laid on behalf of the [Metropolitan District] were laid by [its own] employees . . . ." Id., 196.

Although I agree with the majority that the city's statutory authorization to engage in the construction and maintenance of municipal buildings is a *relevant* factor in determining whether roofing was a part or process in its business, the sheer breadth of municipal powers under § 7-148 (c), which encompasses nearly every conceivable aspect of running a city,[5] means that excessive reliance on that factor would render a municipality the workers' compensation guarantor of virtually every employee of an independent contractor engaged by the city.[6] Thus, I afford greater importance to the city's "actual practice"; *Doyle* v. *Finitsis*, supra, 42 Conn. Supp. 171; with respect to its execution of its statutory powers and responsibilities, which renders the present case distinguishable from *Mancini* and

*Massolini.*[7]

Specifically, the city's broad menu of powers under § 7-148 (c) is distinct from the sewer line construction and maintenance that were the raisons d'être of the Metropolitan District in *Mancini,* which the Metropolitan District accomplished in part with its own employees. *Mancini* v. *Bureau of Public Works,* supra, 167 Conn. 196. In contrast to the driver in *Massolini,* who drove a team of horses hitched to a city owned wagon that was staffed by city employees doing the routine task of refuse collection; *Massolini* v. *Driscoll,* supra, 114 Conn. 548–49; the record in the present case does not reveal any evidence that the plaintiff was working alongside any city employees on the transfer station roof construction project or that the city used its own employees for roofing tasks at any time. John F. Cottell, Jr., the city's Deputy Director of Public Facilities[8] who was the sole witness at the formal hearing before the Workers' Compensation Commissioner, testified that, although the city employed other tradespeople, such as carpenters, electricians, and plumbers, the Bridgeport Department of Public Facilities did not employ any roofers because the lack of regular roofing work rendered it more financially advantageous to hire an outside contractor when necessary.[9] To Cottell's knowledge, the city had never employed a roofer and lacked the funds to do so. Moreover, the record demonstrates that the city engaged in only the most fleeting supervision of the plaintiff's work on this project, with Cottell testifying that he stopped by the roofing project "at least once" but that he did not recall seeing the plaintiff personally.

Put differently, there is no evidence that roofing was a routine, nonspecialized maintenance task integral to the day-to-day operations of the Department of Public Facilities.[10] Thus, I view this case as more akin to *Gaspard* v. *Orleans Parish School Board,* 688 So. 2d 1298, 1302–1303 (La. App. 1997), in which the court held that a school board was not the principal employer of a plumber, an employee of an independent contractor who was injured while replacing a school's plumbing system. In that case, the court observed that the school board "contracts out specialized work such as a replumbing job," which "was not routine work for the [school board, which] did not customarily use [its] own employees for such jobs." Id., 1303. But cf. *Sandhu* v. *State,* Docket No. 1 CA-CV16-0095, 2017 WL 1278982, *3 (Ariz. App. April 6, 2017) (state department of correction was principal employer of dentist employed by independent contractor because, inter alia, it retained control over independent contractor's employees by imposing departmental "policies and procedures while providing health and dental services," and medical care was "a 'part or process'" in department's business rather than "ancillary" function because "[t]he provision of medical and dental services to inmates is a

routine part of [the department's] business, because Arizona law" imposes nondelegable duty on department to provide proper care); *Broward County* v. *Rodrigues*, 686 So. 2d 774, 775 (Fla. App.) (maintenance employee of independent contractor injured while cleaning tank at county owned and operated wastewater treatment plant was statutory employee of county because cleaning of tank was necessary to operation of plant, and county passed on all operating costs pursuant to contract with municipalities), cause dismissed, 690 So. 2d 1300 (Fla. 1997); *Joseph* v. *Parish of St. John the Baptist*, 772 So. 2d 737, 738–39 (La. App. 2000) (employee of independent contractor trash hauler was statutory employee of parish, which was legally required to provide garbage collection, nature of work was routine and nonspecialized, parish had personnel capable of performing work, although it did not have equipment at that time, and parish collected refuse removal fees from its residents"); *Clark* v. *Nevada Industrial Commission*, 99 Nev. 729, 730, 669 P.2d 730 (1983) (county was principal employer of temporary poll workers because "the employment of election workers is clearly within the scope of the county's business of providing governmental services").

Given these authorities and the record in this case, which indicated that the city had never employed its own roofers at any relevant time and contained no evidence that city employees worked alongside the plaintiff or other employees of private contractors on the transfer station roof project, I conclude that the city was not in the business of roofing with respect to its public facilities.[11] Accordingly, the city was not the principal employer liable to pay workers' compensation benefits to the plaintiff under § 31-291.

Because I would reverse the judgment of the Appellate Court, I respectfully dissent.

[1] General Statutes § 31-291 provides: "When any principal employer procures any work to be done wholly or in part for him by a contractor, or through him by a subcontractor, and the work so procured to be done is a part or process in the trade or business of such principal employer, and is performed in, on or about premises under his control, such principal employer shall be liable to pay all compensation under this chapter to the same extent as if the work were done without the intervention of such contractor or subcontractor. The provisions of this section shall not extend immunity to any principal employer from a civil action brought by an injured employee or his dependent under the provisions of section 31-293 to recover damages resulting from personal injury or wrongful death occurring on or after May 28, 1988, unless such principal employer has paid compensation benefits under this chapter to such injured employee or his dependent for the injury or death which is the subject of the action."

[2] The defendants in the matter are (1) the city, (2) the city's insurer, PMA Insurance Company (PMA), (3) the city's contractor, All Roofs by Dominic, and (4) the subcontractor and the plaintiff's employer, Howard Adams d/b/a Howie's Roofing. Once the Workers' Compensation Commissioner determined that the plaintiff's employer was uninsured, the Second Injury Fund (fund) became obligated to pay the plaintiff's compensable claim and participated in this case. See General Statutes § 31-355 (h). Only the fund, the city, and PMA are participating in this appeal. Like the majority, I refer to the fund by name and to the city and PMA collectively as the defendants.

[3] "Prior to 1988, however, § 31-291 did not require the contractor to actually pay workers' compensation benefits to the injured employees in order to

obtain immunity. . . . So long as the employer was a principal employer—and, thus, was *liable* to pay the benefits—the employer enjoyed immunity from civil actions regardless of whether it *actually paid* those benefits." (Citation omitted; emphasis in original.) *Gonzalez* v. *O & G Industries, Inc.*, supra, 322 Conn. 307. The benefits provided by the fund and certificates of insurance provided by subcontractors created an "inequitable situation" because the principal employer received immunity, even though it was "rarely" required to pay workers' compensation benefits. (Internal quotation marks omitted.) Id. Accordingly, in 1988, "the legislature amended § 31-291 to require principal employers to actually pay workers' compensation benefits in order to obtain the statutory immunity from civil actions." Id., 307–308. "[T]he purpose and effect of this amendment was to limit the implied common-law immunity of the principal employer to the situation in which it had *in fact* paid the workers' compensation benefits that presumably were the basis of its immunity. Implicit in this amendment, moreover, was the notion that, except in the *isolated cases* of its application, there would be *no such immunity.*" (Emphasis in original; internal quotation marks omitted.) Id., 308; see also *Sgueglia* v. *Milne Construction Co.*, 212 Conn. 427, 434–35, 562 A.2d 505 (1989) (discussing principal employer's obligation under General Statutes § 31-355 to reimburse fund for benefits paid).

[4] The court stated that it was not concerned with the "part" language of the statute, deeming it "intended to meet situations, for example, [in which] a manufacturer of a general line of hats contracts out the production and distribution of hats of a particular type or [when] a transportation company contracts out the maintenance and operation of one of its branches. We might conceivably have construed the words 'process in the trade or business' as restricted to those situations [in which] a part of the process [that] entered directly into the production of goods by a manufacturer or the performance of the business function of a commercial enterprise was contracted out, as, for example, [when] a manufacturer of optical goods contracted out the rough grinding of the lenses [that] went into the instruments it produced, itself doing the polishing and finishing of the lenses, or [when] a mercantile company contracted out the maintenance and operation of a system for delivery of its goods." *King* v. *Palmer*, supra, 129 Conn. 640.

[5] For example, subdivision (4) of § 7-148 (c) provides that a municipality may: "(A) Provide for police protection, regulate and prescribe the duties of the persons providing police protection with respect to criminal matters within the limits of the municipality and maintain and regulate a suitable place of detention within the limits of the municipality for the safekeeping of all persons arrested and awaiting trial and do all other things necessary or desirable for the policing of the municipality;

"(B) Provide for fire protection, organize, maintain and regulate the persons providing fire protection, provide the necessary apparatus for extinguishing fires and do all other things necessary or desirable for the protection of the municipality from fire;

"(C) Provide for entertainment, amusements, concerts, celebrations and cultural activities, including the direct or indirect purchase, ownership and operation of the assets of one or more sports franchises;

"(D) Provide for ambulance service by the municipality or any person, firm or corporation;

"(E) Provide for the employment of nurses;

"(F) Provide for lighting the streets, highways and other public places of the municipality and for the care and preservation of public lamps, lamp posts and fixtures;

"(G) Provide for the furnishing of water, by contract or otherwise;

"(H) Provide for or regulate the collection and disposal of garbage, trash, rubbish, waste material and ashes by contract or otherwise, including prohibiting the throwing or placing of such materials on the highways; [and]

"(I) Provide for the financing, construction, rehabilitation, repair, improvement or subsidization of housing for low and moderate income persons and families . . . ."

With respect to public works, sewers, and highways, subdivision (6) of § 7-148 (c) provides in relevant part that a municipality may: "(A) . . . (i) Establish, lay out, construct, reconstruct, alter, maintain, repair, control and operate cemeteries, public burial grounds, hospitals, clinics, institutions for children and aged, infirm and chronically ill persons, bus terminals and airports and their accessories, docks, wharves, school houses, libraries, parks, playgrounds, playfields, fieldhouses, baths, bathhouses, swimming pools, gymnasiums, comfort stations, recreation places, public beaches, beach facilities, public gardens, markets, garbage and refuse disposal facili-

ties, parking lots and other off-street parking facilities, and any and all buildings or facilities necessary or convenient for carrying on the government of the municipality;

"(ii) Create, provide for, construct, regulate and maintain all things in the nature of public works and improvements;

"(iii) Enter into or upon any land for the purpose of making necessary surveys or mapping in connection with any public improvement, and take by eminent domain any lands, rights, easements, privileges, franchises or structures which are necessary for the purpose of establishing, constructing or maintaining any public work, or for any municipal purpose, in the manner prescribed by the general statutes;

"(iv) Regulate and protect from injury or defacement all public buildings, public monuments, trees and ornaments in public places and other public property in the municipality;

"(v) Provide for the planting, rearing and preserving of shade and ornamental trees on the streets and public grounds;

"(vi) Provide for improvement of waterfronts by a board, commission or otherwise;

"(B) . . . (i) Lay out, construct, reconstruct, repair, maintain, operate, alter, extend and discontinue sewer and drainage systems and sewage disposal plants . . . .

* * *

"(C) . . . (i) Lay out, construct, reconstruct, alter, maintain, repair, control, operate, and assign numbers to streets, alleys, highways, boulevards, bridges, underpasses, sidewalks, curbs, gutters, public walks and parkways;

"(ii) Keep open and safe for public use and travel and free from encroachment or obstruction the streets, sidewalks and public places in the municipality . . . .

* * *

"(v) Require owners or occupants of land adjacent to any sidewalk or public work to remove snow, ice, sleet, debris or any other obstruction therefrom, provide penalties upon their failure to do so, and cause such snow, ice, sleet, debris or other obstruction to be removed and make the cost of such removal a lien on such property . . . ."

[6] My research reveals that Virginia case law, some of which is cited with approval by the majority, strictly distinguishes governmental entities and public utilities from private sector employers for purposes of the business aspect of its "statutory employer" test, which is akin to our principal employer status. In this context, the Virginia Supreme Court has rejected a test akin to that in *King* v. *Palmer*, supra, 129 Conn. 640–41, for private employers, which considered whether the work at issue would "normally [be] carried on through . . . employees rather than independent contractors," describing it as "not designed for every situation. It works best in cases involving private businesses because those entities often define their trade, business, or occupation by their conduct. With regard to such entities, what they do on a day-to-day basis provides a reasonably reliable indicator of their trade, business, or occupation.

"Yet, public utilities and governmental entities are of another class. It is not simply what they do that defines their trade, business, or occupation. What they are supposed to do is also a determinant. Whereas a private business entity is essentially self-defining in terms of its trade, business, or occupation, a public utility has duties, obligations, and responsibilities imposed [on] it by statute, regulation, or other means." (Emphasis omitted; internal quotation marks omitted.) *Ford* v. *Richmond*, 239 Va. 664, 666–67, 391 S.E.2d 270 (1990), quoting *Henderson* v. *Central Telephone Co. of Virginia*, 233 Va. 377, 383, 355 S.E.2d 596 (1987). The court went on to conclude in *Ford* that a contractor's employee who was injured while repairing a roof over a reservoir at a municipal waterworks was a statutory employee of the city of Richmond, which "was authorized and empowered by legislative mandate to perform certain public duties including . . . the maintenance of a public facility. Under the test applicable to governmental entities, the maintenance work delegated by contract to [the contractor] and performed by its employee, [Curtis E.] Ford, was part of the trade, business or occupation of [Richmond]. As an owner performing such work through an independent contractor, [Richmond] was Ford's statutory employer," and workers' compensation benefits constituted "Ford's exclusive rights and remedies for the injury by accident . . . arising out of and in the course of the employment . . . ." (Citations omitted; internal quotation marks omitted.) *Ford* v. *Richmond*, supra, 669; see *Jones* v. *Commonwealth*, 267 Va. 218, 224–25, 591 S.E.2d 72 (2004) (concluding, without analysis of work of univer-

sity's employees, that independent contractor injured while performing asbestos abatement at public university was statutory employee of university because of statute charging its "Board of Visitors . . . 'with the care and preservation of all property belonging to the [u]niversity' "); *Roberts* v. *Alexandria*, 246 Va. 17, 19–20, 431 S.E.2d 275 (1993) (holding that city of Alexandria was statutory employer of employee of medical services provider that sheriff had contracted with to provide medical services at city jail because Alexandria "clearly is authorized and empowered [by state statute] to provide medical services to the jail's inmates" and because Alexandria pays costs of operating jail from its general fund revenues).

I note that the Virginia analysis for determining a statutory employer in the governmental context has been criticized as "out of step" with other courts. *Best* v. *Washington Metropolitan Area Transit Authority*, 822 F.2d 1198, 1202 (D.C. Cir.1987) (Mikva, J., concurring); see id. (Mikva, J., concurring) (accepting *Henderson* as binding statement of state law in concluding that independent contractor's employee, who was injured when fixing escalator in subway station, was statutory employee of transit authority because "his employer contracted with a governmental entity [the] broad statutory mandate [of which] appears to embrace escalator repair"); see also *Hose* v. *United States*, 604 F. Supp. 2d 147, 151–52 (D.D.C. 2009) (citing federal cases showing broad application of Virginia law). I agree. With no consideration of a municipality's actual practices, the Virginia approach renders municipalities the guarantor of virtually every employee of any contractor that they engage, particularly given the broad statutory authority of municipalities to act in a variety of areas. I am concerned that the primacy that the majority places on the statutory mandate under § 7-148 (c)—with no evidence that the city ever used its own employees to engage in roofing tasks or to perform actual work alongside the contracted roofers—puts Connecticut on the same path.

[7] I respectfully disagree with the majority's reliance on *Pacileo* v. *Morganti, Inc.*, 10 Conn. App. 261, 522 A.2d 841 (1987). In *Pacileo*, the Appellate Court concluded that a general contractor was the principal employer of an ironworker because "the defendant's business, as the general contractor, was to oversee and implement the construction of the city hall library complex. . . . A necessary and expected part of that construction was the laying of steel rods for the pouring of concrete. Ironworkers generally lay steel rods. Since none of the individuals directly employed by [the defendant was] qualified to perform the job of ironworker . . . the utilization of ironworkers such as the plaintiff was a part or process of the defendant's trade or business." (Internal quotation marks omitted.) Id., 264. A general construction contractor, who voluntarily undertakes the organization of a major construction project as a commercial venture, is situated differently from a municipality that has broad statutory powers in a variety of areas and makes operational decisions as to the best way to implement those powers and responsibilities.

[8] As the city's Deputy Director of Public Facilities, Cottell supervised departmental divisions for roadway maintenance, recycling and sanitation, the city's municipal garage, and the city's Board of Education facilities, and also worked with other department heads for divisions such as maintenance and parks and recreation. He oversaw city employees, as well as the hiring of relevant contractors.

[9] Cottell testified that the city would hire outside contractors with respect to the other trades if necessary based on the size of the job, the amount of time that the job would require, and other working demands on his department.

[10] I note that the record is silent as to the city's construction and maintenance practices with respect to its public housing; see General Statutes § 7-148 (c) (4) (I); and Cottell testified that the Department of Public Facilities was not responsible for the construction and maintenance of public housing facilities. Given the importance of a roof to housing, I leave open the possibility that a city that owns and operates public housing facilities might be akin to a real estate developer, rendering roofing and related services part of the business of providing public housing. See *Rodriquez* v. *John Russell Construction*, 16 Kan. App. 2d 269, 274–75, 826 P.2d 515 (1991) (The court held that the municipality was the "statutory employer" of a privately employed roofer who was injured while repairing the roof of a public housing complex because, when a municipality "becomes involved as a local housing authority, its trade or business becomes everything inherent to the ownership and operation of an apartment complex with a large number of tenants. . . . Roof repair was essential to protect the building and ensure that it

remained habitable."); see also *Mahaffey* v. *United States*, 785 F. Supp. 148, 149–51 (D. Kan. 1992) (United States Army was principal employer of independent construction contractor's laborer because, "through the Army Corps of Engineers and the Directorate of Engineering and Housing at Fort Riley, Kansas, [it was] responsible for designing, constructing, maintaining and supervising military facilities," rendering "the construction and maintenance of barracks . . . inherent in and an integral part of [the] United States Army's trade or business").

[11] Although this appeal turns on the third element, namely, whether the city was in the trade or business of roofing, I briefly address the second element of the principal employer test, which concerns whether "the work must be on or about premises controlled by the principal employer . . . ." (Internal quotation marks omitted.) *Gonzalez* v. *O & G Industries, Inc.*, supra, 322 Conn. 303 n.13. I suggest that the historical purpose of the principal employer doctrine is better accomplished when the focus is on authority over the conditions of the workplace at issue rather than on authority over the premises in general, such as that conferred by property ownership. See *Grenier* v. *Grenier*, supra, 138 Conn. 572 ("[t]he special purpose of [the act] is to protect employees of minor contractors against the possible irresponsibility of their immediate employers, by making the principal employer *who has general control of the business in hand* liable as if he had directly employed all who work [on] any part of the business [that] he has undertaken to carry on" (emphasis added; internal quotation marks omitted)); *Wilson* v. *Largay Brewing Co.*, 125 Conn. 109, 112, 3 A.2d 668 (1939) ("[t]he underlying purpose of the restriction as to the place of employment in the various acts was obviously *to limit liability to those situations* [*in which*] *such conditions might be assumed to be largely within the control or observation of the principal employer*" (emphasis added)). This distinction is most readily apparent in considering a general contractor relative to its subcontractors, with the other extreme represented by a homeowner who may, as a matter of law, own or control the premises but hires individuals for home improvement projects because they do not have the expertise or tools to engage in this work safely or competently. This consideration, however, would also likely be reflected in the third "trade or business" element, as well, given its consideration of whether the principal employer's own employees are working alongside the contractor's employees on the project at issue. See *Grenier* v. *Grenier*, supra, 571–72 (criticizing *Bello* v. *Notkins*, 101 Conn. 34, 36–38, 124 A. 831 (1924), which held that homeowner was principal employer of independent contractor employee who was building house for homeowner's own use, and suggesting that decision was driven by fact that homeowner's "business . . . was building houses").